# COMMUNITY COMMUNICATIONS CO., INC. v. CITY OF BOULDER, COLORADO, ET AL.

No. 80–1350.   Argued October 13, 1981—Decided January 13, 1982

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 58. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and O'CONNOR, J., joined, *post*, p. 60. WHITE, J., took no part in the consideration or decision of the case.

*Harold R. Farrow* argued the cause for petitioner. With him on the briefs were *Thomas A. Seaton* and *Robert E. Youle.*

*Jeffrey H. Howard* argued the cause for respondents. With him on the brief were *Kathleen A. McGinn, Dale R. Harris, Bruce T. Reese, Joseph N. de Raismes,* and *Alan E. Boles, Jr.*

*Thomas P. McMahon,* Assistant Attorney General of Colorado, argued the cause for the State of Colorado et al. as *amici curiae* urging reversal. With him on the brief were *J. D. MacFarlane,* Attorney General of Colorado, *Mary J. Mullarkey,* Solicitor General, and *B. Lawrence Theis,* First Assistant Attorney General; *Wilson L. Condon,* Attorney

42

General of Alaska, and *Louise E. Ma* and *Mark E. Ashburn*, Assistant Attorneys General; *Steve Clark*, Attorney General of Arkansas, and *David L. Williams*, Deputy Attorney General; *Richard S. Gebelein*, Attorney General of Delaware, and *Robert P. Lobue*, Deputy Attorney General; *Tany S. Hong*, Attorney General of Hawaii, and *Shelton G. W. Jim On*, Deputy Attorney General; *Tyrone C. Fahner*, Attorney General of Illinois, and *Thomas M. Genovese*, Assistant Attorney General; *Thomas J. Miller*, Attorney General of Iowa, and *John R. Perkins*, Assistant Attorney General; *Robert T. Stephan*, Attorney General of Kansas, and *Wayne E. Hundley*, Deputy Attorney General; *Richard S. Cohen*, Attorney General of Maine; *Stephen H. Sachs*, Attorney General of Maryland, and *Charles O. Monk II*, Assistant Attorney General; *Warren R. Spannaus*, Attorney General of Minnesota, and *Stephen P. Kilgriff*, Special Assistant Attorney General; *John Ashcroft*, Attorney General of Missouri, and *William Newcomb*, Assistant Attorney General; *Mike Greely*, Attorney General of Montana, and *Jerome J. Cate*; *Paul L. Douglas*, Attorney General of Nebraska, and *Dale A. Comer*, Assistant Attorney General; *Jeff Bingaman*, Attorney General of New Mexico, and *James A. Wechsler* and *Richard H. Levin*, Assistant Attorneys General; *Robert Abrams*, Attorney General of New York, and *Lloyd Constantine*, Assistant Attorney General; *William J. Brown*, Attorney General of Ohio, and *Eugene F. McShane*, Assistant Attorney General; *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, and *Eugene F. Waye* and *John L. Shearburn*, Deputy Attorneys General; *Dennis J. Roberts II*, Attorney General of Rhode Island, and *Patrick J. Quinlan*, Special Assistant Attorney General; *Mark White*, Attorney General of Texas, and *Linda A. Aaker,* Assistant Attorney General; *John J. Easton, Jr.*, Attorney General of Vermont, and *Jay I. Ashman* and *Glenn A. Jarrett*, Assistant Attorneys General; *Chauncey H. Browning*, Attorney General of West Vir-

ginia, and *Charles G. Brown*, Deputy Attorney General; and *Bronson C. La Follette*, Attorney General of Wisconsin, and *Michael L. Zaleski*, Assistant Attorney General.*

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented in this case, in which the District Court for the District of Colorado granted preliminary injunctive relief, is whether a "home rule" municipality, granted by the state constitution extensive powers of self-government in local and municipal matters, enjoys the "state action" exemption from Sherman Act liability announced in *Parker* v. *Brown*, 317 U. S. 341 (1943).

I

Respondent city of Boulder is organized as a "home rule" municipality under the Constitution of the State of Colorado.[1] The city is thus entitled to exercise "the full right of self-government in both local and municipal matters," and with respect to such matters the City Charter and ordinances

---

*J. D. MacFarlane*, Attorney General of Colorado, *Richard F. Hennessey*, Deputy Attorney General, *Mary J. Mullarkey*, Solicitor General, *B. Lawrence Theis*, First Assistant Attorney General, and *Thomas P. McMahon*, Assistant Attorney General, filed a brief for the State of Colorado as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Bingham Kennedy* and *Howard J. Gan* for the Cable Television Information Center; by *Robert D. Pritt, John D. Cummins*, and *Glenn M. Young* for the City of Akron, Ohio, et al.; by *Burt Pines, James A. Doherty*, and *John F. Haggerty* for the City of Los Angeles; by *Susan K. Griffiths* for the Colorado Municipal League; by *Roger F. Cutler, John Dekker, James B. Brennan, Henry W. Underhill, Jr.*, and *Benjamin L. Brown* for the National Institute of Municipal Law Officers; and by *Ross D. Davis, Howard W. Fogt, Jr., Jay N. Varon*, and *Catherine B. Klarfeld* for the National League of Cities.

[1] The Colorado Home Rule Amendment, Colo. Const., Art. XX, § 6, provides in pertinent part:

"The people of each city or town of this state, having a population of two thousand inhabitants . . . , are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or

supersede the laws of the State. Under that Charter, all municipal legislative powers are exercised by an elected City Council.[2] In 1964 the City Council enacted an ordinance granting to Colorado Televents, Inc., a 20-year, revocable, nonexclusive permit to conduct a cable television business within the city limits. This permit was assigned to petitioner in 1966, and since that time petitioner has provided cable television service to the University Hill area of Boulder, an area where some 20% of the city's population lives, and where, for geographical reasons, broadcast television signals cannot be received.

From 1966 until February 1980, due to the limited service that could be provided with the technology then available, petitioner's service consisted essentially of retransmissions of programming broadcast from Denver and Cheyenne, Wyo. Petitioner's market was therefore confined to the University Hill area. However, markedly improved technology became available in the late 1970's, enabling petitioner to offer many more channels of entertainment than could be provided by local broadcast television.[3] Thus presented with an oppor-

---

town, which shall be its organic law and extend to all its local and municipal matters.

"Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.

. . . . .

"It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both local and municipal matters . . . .

"The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except insofar as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters."

[2] Boulder, Colo., Charter § 11 (1965 rev. ed.).

[3] The District Court below noted:

"Up to late 1975, cable television throughout the country was concerned primarily with retransmission of television signals to areas which did not have normal reception, with some special local weather and news services

tunity to expand its business into other areas of the city, petitioner in May 1979 informed the City Council that it planned such an expansion. But the new technology offered opportunities to potential competitors, as well, and in July 1979 one of them, the newly formed Boulder Communications Co. (BCC),[4] also wrote to the City Council, expressing its interest in obtaining a permit to provide competing cable television service throughout the city.[5]

The City Council's response, after reviewing its cable television policy,[6] was the enactment of an "emergency" ordi-

---

originated by the cable operators. During the late 1970's however, satellite technology impacted the industry and prompted a rapid, almost geometric rise in its growth. As earth stations became less expensive, and 'Home Box Office' companies developed, the public response to cable television greatly increased the market demand for such expanded services.

"The 'state of the art' presently allows for more than 35 channels, including movies, sports, FM radio, and educational, children's, and religious programming. The institutional uses for cable television are fast increasing, with technology for two-way service capability. Future potential for cable television is referred to as 'blue sky', indicating that virtually unlimited technological improvements are still expected." 485 F. Supp. 1035, 1036–1037 (1980).

[4] BCC was a defendant below, and is a respondent here.

[5] Regarding this letter, the District Court noted that "BCC outlined a proposal for a new system, acknowledging the presence of [petitioner] in Boulder but stating that '(w)hatever action the City takes in regard to [petitioner], it is the plan of BCC to begin building its system as soon as feasible after the City grants BCC its permit.'" Id., at 1037.

[6] "The . . . City Council . . . initiat[ed] a review and reconsideration of cable television in view of the many changes in the industry since . . . 1964 . . . . Accordingly, they hired a consultant, . . . and held a number of study meetings to develop a governmental response to these changes. The primary thrust of [the consultant's] advice was that the City should be concerned about the tendency of a cable system to become a natural monopoly. Much discussion in the City Council centered around a supposed unfair advantage that [petitioner] had because it was already operating in Boulder. Members of the Council, and the City Manager, expressed fears that [petitioner might] not be the best cable operator for Boulder, but would nonetheless be the only operator because of its head start in the area. The Council wanted to create a situation in which other cable

nance prohibiting petitioner from expanding its business into other areas of the city for a period of three months.[7] The City Council announced that during this moratorium it planned to draft a model cable television ordinance and to invite new businesses to enter the Boulder market under its terms, but that the moratorium was necessary because petitioner's continued expansion during the drafting of the model ordinance would discourage potential competitors from entering the market.[8]

Petitioner filed this suit in the United States District Court for the District of Colorado, and sought, *inter alia*, a preliminary injunction to prevent the city from restricting petition-

---

companies could make offers and not be hampered by the possibility that [petitioner] would build out the whole area before they even arrived." *Ibid.*

[7] The preamble to this ordinance offered the following declarations as justification for its enactment:

"[C]able television companies have within recent months displayed interest in serving the community and have requested the City Council to grant [them] permission to use the public right-of-way in providing that service; and

" . . . the present permittee, [petitioner], has indicated that it intends to extend its services in the near future . . . ; and

" . . . the City Council finds that such an extension . . . would result in hindering the ability of other companies to compete in the Boulder market; and

" . . . the City Council intends to adopt a model cable television permit ordinance, solicit applications from interested cable television companies, evaluate such applications, and determine whether or not to grant additional permits . . . [within] 3 months, and finds that an extension of service by [petitioner] would result in a disruption of this application and evaluation process; and

" . . . the City Council finds that placing temporary geographical limitations upon the operations of [petitioner] would not impair the present services offered by [it] to City of Boulder residents, and would not impair [its] ability . . . to improve those services within the area presently served by it." Boulder, Colo., Ordinance No. 4473 (1979).

[8] The Council reached this conclusion despite BCC's statement to the contrary, see n. 5, *supra*.

er's proposed business expansion, alleging that such a restriction would violate § 1 of the Sherman Act.[9] The city responded that its moratorium ordinance could not be violative of the antitrust laws, either because that ordinance constituted an exercise of the city's police powers, or because Boulder enjoyed antitrust immunity under the *Parker* doctrine. The District Court considered the city's status as a home rule municipality, but determined that that status gave autonomy to the city only in matters of local concern, and that the operations of cable television embrace "wider concerns, including interstate commerce . . . [and] the First Amendment rights of communicators." 485 F. Supp. 1035, 1038–1039 (1980). Then, assuming, *arguendo*, that the ordinance was within the city's authority as a home rule municipality, the District Court considered *City of Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389 (1978), and concluded that the *Parker* exemption was "wholly inapplicable," and that the city was therefore subject to antitrust liability. 485 F. Supp., at 1039.[10] Petitioner's motion for a preliminary injunction was accordingly granted.

On appeal, a divided panel of the United States Court of Appeals for the Tenth Circuit reversed. 630 F. 2d 704 (1980). The majority, after examining Colorado law, rejected the District Court's conclusion that regulation of the cable television business was beyond the home rule authority

---

[9] 26 Stat. 209, as amended, 15 U. S. C. § 1. Section 1 of the Sherman Act provides in pertinent part that "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States . . . , is declared to be illegal."

Petitioner also alleged, *inter alia*, that the city and BCC were engaged in a conspiracy to restrict competition by substituting BCC for petitioner. The District Court noted that although petitioner had gathered some circumstantial evidence that might indicate such a conspiracy, the evidence was insufficient to establish a probability that petitioner would prevail on this claim. 485 F. Supp., at 1038.

[10] The District Court also held that no *per se* antitrust violation appeared on the record before it, and that petitioner was not protected by the First Amendment from all regulation attempted by the city. *Id.*, at 1039–1040.

of the city. *Id.*, at 707. The majority then addressed the question of the city's claimed *Parker* exemption. It distinguished the present case from *City of Lafayette* on the ground that, in contrast to the municipally operated revenue-producing utility companies at issue there, "no proprietary interest of the City is here involved." 630 F. 2d, at 708. After noting that the city's regulation "was the only control or active supervision exercised by state or local government, and . . . represented the only expression of policy as to the subject matter," *id.*, at 707, the majority held that the city's actions therefore satisfied the criteria for a *Parker* exemption, 630 F. 2d, at 708.[11] We granted certiorari, 450 U. S. 1039 (1981). We reverse.

## II

### A

*Parker* v. *Brown*, 317 U. S. 341 (1943), addressed the question whether the federal antitrust laws prohibited a State, in the exercise of its sovereign powers, from imposing certain anticompetitive restraints. These took the form of a "marketing program" adopted by the State of California for the 1940 raisin crop; that program prevented appellee from freely marketing his crop in interstate commerce. *Parker* noted that California's program "derived its authority . . .

---

[11] The majority cited *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), as support for its reading of *City of Lafayette*, and concluded "that *City of Lafayette* is not applicable to a situation wherein the governmental entity is asserting a governmental rather than proprietary interest, and that instead the *Parker-Midcal* doctrine is applicable to exempt the City from antitrust liability." 630 F. 2d, at 708.

The dissent urged affirmance, agreeing with the District Court's analysis of the antitrust exemption issue. *Id.*, at 715–718 (Markey, C. J., United States Court of Customs and Patent Appeals, sitting by designation, dissenting). The dissent also considered the city's actions to violate "[c]ommon principles of contract law and equity," *id.*, at 715, as well as the First Amendment rights of petitioner and its customers, both actual and potential, *id.*, at 710–714. The petition for certiorari did not present the First Amendment question, and we do not address it in this opinion.

from the legislative command of the state," *id.*, at 350, and went on to hold that the program was therefore exempt, by virtue of the Sherman Act's own limitations, from antitrust attack:

> "We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.*, at 350–351.

The availability of this exemption to a State's municipalities was the question presented in *City of Lafayette, supra.* In that case, petitioners were Louisiana cities empowered to own and operate electric utility systems both within and beyond their municipal limits. Respondent brought suit against petitioners under the Sherman Act, alleging that they had committed various antitrust offenses in the conduct of their utility systems, to the injury of respondent. Petitioners invoked the *Parker* doctrine as entitling them to dismissal of the suit. The District Court accepted this argument and dismissed. But the Court of Appeals for the Fifth Circuit reversed, holding that a "subordinate state governmental body is not *ipso facto* exempt from the operation of the antitrust laws," *City of Lafayette* v. *Louisiana Power & Light Co.*, 532 F. 2d 431, 434 (1976) (footnote omitted), and directing the District Court on remand to examine "whether the state legislature contemplated a certain type of anticompetitive restraint," *ibid.*[12]

---

[12] The Court of Appeals described the applicable standard as follows:

"[I]t is not necessary to point to an express statutory mandate for each act which is alleged to violate the antitrust laws. It will suffice if the chal-

This Court affirmed. In doing so, a majority rejected at the outset petitioners' claim that, quite apart from *Parker*, "Congress never intended to subject local governments to the antitrust laws." 435 U. S., at 394. A plurality opinion for four Justices then addressed petitioners' argument that *Parker*, properly construed, extended to "all governmental entities, whether state agencies or subdivisions of a State, . . . simply by reason of their status as such." 435 U. S., at 408. The plurality opinion rejected this argument, after a discussion of *Parker*, *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), and *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977).[13] These precedents were construed as holding that the *Parker* exemption reflects the federalism principle that we are a Nation of *States*, a principle that makes no accommodation for sovereign subdivisions of States. The plurality opinion said:

> "Cities are not themselves sovereign; they do not receive all the federal deference of the States that create them. *Parker*'s limitation of the exemption to 'official action directed by a state,' is consistent with the fact that the States' subdivisions generally have not been treated as

---

lenged activity was clearly within the legislative intent. Thus, a trial judge may ascertain, from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of. On the other hand, the connection between a legislative grant of power and the subordinate entity's asserted use of that power may be too tenuous to permit the conclusion that the entity's intended scope of activity encompassed such conduct. . . . A district judge's inquiry on this point should be broad enough to include all evidence which might show the scope of legislative intent." 532 F. 2d, at 434–435 (footnote and citation omitted).

[13] THE CHIEF JUSTICE, in a concurring opinion, focused on the nature of the challenged activity rather than the identity of the parties to the suit. 435 U. S., at 420. He distinguished between "the proprietary enterprises of municipalities," *id.*, at 422 (footnote omitted), and their "traditional government functions," *id.*, at 424, and viewed the *Parker* exemption as extending to municipalities only when they engaged in the latter.

equivalents of the States themselves. In light of the serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws, we are especially unwilling to presume that Congress intended to exclude anticompetitive municipal action from their reach." 435 U. S., at 412–413 (footnote and citations omitted).

The opinion emphasized, however, that the State as sovereign might sanction anticompetitive municipal activities and thereby immunize municipalities from antitrust liability. Under the plurality's standard, the *Parker* doctrine would shield from antitrust liability municipal conduct engaged in "pursuant to state policy to displace competition with regulation or monopoly public service." 435 U. S., at 413. This was simply a recognition that a State may frequently choose to effect its policies through the instrumentality of its cities and towns. It was stressed, however, that the "state policy" relied upon would have to be "clearly articulated and affirmatively expressed." *Id.*, at 410. This standard has since been adopted by a majority of the Court. *New Motor Vehicle Board of California* v. *Orrin W. Fox Co.*, 439 U. S. 96, 109 (1978); *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 105 (1980).[14]

---

[14] In *Midcal* we held that a California resale price maintenance system, affecting all wine producers and wholesalers within the State, was not entitled to exemption from the antitrust laws. In so holding, we explicitly adopted the principle, expressed in the plurality opinion in *City of Lafayette*, that anticompetitive restraints engaged in by state municipalities or subdivisions must be "clearly articulated and affirmatively expressed as state policy" in order to gain an antitrust exemption. *Midcal*, 445 U. S., at 105. The price maintenance system at issue in *Midcal* was denied such an exemption because it failed to satisfy the "active state supervision" criterion described in *City of Lafayette*, 435 U. S., at 410, as underlying our decision in *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977). Because we conclude in the present case that Boulder's moratorium ordinance does

## B

Our precedents thus reveal that Boulder's moratorium ordinance cannot be exempt from antitrust scrutiny unless it constitutes the action of the State of Colorado itself in its sovereign capacity, see *Parker*, or unless it constitutes municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy, see *City of Lafayette*, *Orrin W. Fox Co.*, and *Midcal*. Boulder argues that these criteria are met by the direct delegation of powers to municipalities through the Home Rule Amendment to the Colorado Constitution. It contends that this delegation satisfies both the *Parker* and the *City of Lafayette* standards. We take up these arguments in turn.

## (1)

Respondent city's *Parker* argument emphasizes that through the Home Rule Amendment the people of the State of Colorado have vested in the city of Boulder "*'every power theretofore possessed by the legislature . . . in local and municipal affairs.'*"[15] The power thus possessed by Boul-

---

not satisfy the "clear articulation and affirmative expression" criterion, we do not reach the question whether that ordinance must or could satisfy the "active state supervision" test focused upon in *Midcal*.

[15] *Denver Urban Renewal Authority* v. *Byrne*, 618 P. 2d 1374, 1381 (1980), quoting *Four-County Metropolitan Capital Improvement District* v. *Board of County Comm'rs*, 149 Colo. 284, 294, 369 P. 2d 67, 72 (1962) (emphasis in original). The *Byrne* court went on to state that "by virtue of Article XX, a home rule city is not inferior to the General Assembly concerning its local and municipal affairs." 618 P. 2d, at 1381. Petitioner strongly disputes respondent city's premise and its construction of *Byrne*, citing *City and County of Denver* v. *Sweet*, 138 Colo. 41, 48, 329 P. 2d 441, 445 (1958), *City and County of Denver* v. *Tihen*, 77 Colo. 212, 219–220, 235 P. 777, 780–781 (1925), and 2 E. McQuillin, Municipal Corporations § 9.08a, p. 638 (1979), as contrary authority. But it is not for us to determine the correct view on this issue as a matter of state law. *Parker* affords an exemption from *federal* antitrust laws, based upon *Congress'* intentions respecting the scope of those laws. Thus the availability of the *Parker* exemption is and must be a matter of federal law.

der's City Council assertedly embraces the regulation of cable television, which is claimed to pose essentially local problems.[16] Thus, it is suggested, the city's cable television moratorium ordinance is an "act of government" performed by the city *acting as the State* in local matters, which meets the "state action" criterion of *Parker.*[17]

We reject this argument: it both misstates the letter of the law and misunderstands its spirit. The *Parker* state-action exemption reflects Congress' intention to embody in the Sherman Act the federalism principle that the States possess a significant measure of sovereignty under our Constitution. But this principle contains its own limitation: Ours is a *"dual system of government," Parker,* 317 U. S., at 351 (emphasis added), which has no place for sovereign cities. As this Court stated long ago, all sovereign authority "within the geographical limits of the United States" resides either with

> "the Government of the United States, or [with] the States of the Union. *There exist within the broad domain of sovereignty but these two.* There may be cities, counties, and other organized bodies with limited legisla-

---

[16] Boulder cites the decision of the Colorado Supreme Court in *Manor Vail Condominium Assn.* v. *Vail,* 199 Colo. 62, 66–67, 604 P. 2d 1168, 1171–1172 (1980), as authority for the proposition that the regulation of cable television is a local matter. Petitioner disputes this proposition and Boulder's reading of *Manor Vail,* citing in rebuttal *United States* v. *Southwestern Cable Co.,* 392 U. S. 157, 168–169 (1968), holding that cable television systems are engaged in interstate communication. In this contention, petitioner is joined by the State of Colorado, which filed an *amicus* brief in support of petitioner. For the purposes of this decision we will assume, without deciding, that respondent city's enactment of the moratorium ordinance under challenge here did fall within the scope of the power delegated to the city by virtue of the Colorado Home Rule Amendment.

[17] Respondent city urges that the only distinction between the present case and *Parker* is that here the "act of government" is imposed by a home rule city rather than by the state legislature. Under *Parker* and Colorado law, the argument continues, this is a distinction without a difference, since in the sphere of local affairs home rule cities in Colorado possess every power once held by the state legislature.

tive functions, but they are all derived from, or exist in, subordination to one or the other of these." *United States* v. *Kagama,* 118 U. S. 375, 379 (1886) (emphasis added).

The dissent in the Court of Appeals correctly discerned this limitation upon the federalism principle: "We are a nation not of 'city-states' but of States." 630 F. 2d, at 717. *Parker* itself took this view. When *Parker* examined Congress' intentions in enacting the antitrust laws, the opinion, as previously indicated, noted: "[N]othing in the language of the Sherman Act or in its history . . . suggests that its purpose was to restrain a state or its officers or agents from activities *directed by its legislature.* . . . [And] an unexpressed purpose to nullify a *state's control over its officers and agents* is not lightly to be attributed to Congress." 317 U. S., at 350–351 (emphasis added). Thus *Parker* recognized Congress' intention to limit the state-action exemption based upon the federalism principle of limited state sovereignty. *City of Lafayette, Orrin W. Fox Co.,* and *Midcal* reaffirmed both the vitality and the intrinsic limits of the *Parker* state-action doctrine. It was expressly recognized by the plurality opinion in *City of Lafayette* that municipalities "are not themselves sovereign," 435 U. S., at 412, and that accordingly they could partake of the *Parker* exemption only to the extent that they acted pursuant to a clearly articulated and affirmatively expressed state policy, 435 U. S., at 413. The Court adopted this view in *Orrin W. Fox Co.,* 439 U. S., at 109, and *Midcal,* 445 U. S., at 105. We turn then to Boulder's contention that its actions were undertaken pursuant to a clearly articulated and affirmatively expressed state policy.

(2)

Boulder first argues that the requirement of "clear articulation and affirmative expression" is fulfilled by the Colorado Home Rule Amendment's "guarantee of local autonomy." It contends, quoting from *City of Lafayette,* 435 U. S., at 394,

415, that by this means Colorado has "comprehended within the powers granted" to Boulder the power to enact the challenged ordinance, and that Colorado has thereby "contemplated" Boulder's enactment of an anticompetitive regulatory program. Further, Boulder contends that it may be inferred, "from the authority given" to Boulder "to operate in a particular area"—here, the asserted home rule authority to regulate cable television—"that the *legislature* contemplated the kind of action complained of." (Emphasis supplied.) Boulder therefore concludes that the "adequate state mandate" required by *City of Lafayette, supra,* at 415, is present here.[18]

But plainly the requirement of "clear articulation and affirmative expression" is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have "contemplated" the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as "comprehended within the powers *granted,*" since the term, "granted," necessarily implies an affirmative addressing of the subject by the State. The State did not do so here: The relationship of the State of Colorado to Boulder's moratorium ordinance is one of precise neutrality. As the majority in the Court of Appeals below acknowledged: "[W]e are here concerned with City action in the absence of any regulation whatever by the State of Colorado. Under these circumstances there is no interaction of state and local regulation. We have only the action or exercise of authority by the City." 630 F. 2d, at 707. Indeed, Boulder argues that

---

[18] Boulder also contends that its moratorium ordinance qualifies for antitrust immunity under the test set forth by THE CHIEF JUSTICE in his *City of Lafayette* concurrence, see n. 13, *supra,* because the challenged activity is clearly a "traditional government function," rather than a "proprietary enterprise."

as to local matters regulated by a home rule city, the Colorado General Assembly is without power to act. Cf. *City of Lafayette, supra,* at 414, and n. 44. Thus in Boulder's view, it can pursue its course of regulating cable television competition, while another home rule city can choose to prescribe monopoly service, while still another can elect free-market competition: and all of these policies are equally "contemplated," and "comprehended within the powers granted." Acceptance of such a proposition—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances—would wholly eviscerate the concepts of "clear articulation and affirmative expression" that our precedents require.

## III

Respondents argue that denial of the *Parker* exemption in the present case will have serious adverse consequences for cities, and will unduly burden the federal courts. But this argument is simply an attack upon the wisdom of the longstanding congressional commitment to the policy of free markets and open competition embodied in the antitrust laws.[19] Those laws, like other federal laws imposing civil or criminal sanctions upon "persons," of course apply to municipalities as well as to other corporate entities.[20] Moreover, judicial en-

---

[19] "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster." *United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 610 (1972).

[20] See *City of Lafayette,* 435 U. S., at 394–397.

We hold today only that the *Parker* v. *Brown* exemption was no bar to the District Court's grant of injunctive relief. This case's preliminary posture makes it unnecessary for us to consider other issues regarding the applicability of the antitrust laws in the context of suits by private litigants

forcement of Congress' will regarding the state-action exemption renders a State "no less able to allocate governmental power between itself and its political subdivisions. It means only that when the State itself has not directed or authorized an anticompetitive practice, the State's subdivisions in exercising their delegated power must obey the antitrust laws." *City of Lafayette*, 435 U. S., at 416. As was observed in that case:

> "Today's decision does not threaten the legitimate exercise of governmental power, nor does it preclude municipal government from providing services on a monopoly basis. *Parker* and its progeny make clear that a State properly may . . . direct or authorize its instrumentalities to act in a way which, if it did not reflect state policy, would be inconsistent with the antitrust laws. . . . [A]ssuming that the municipality is authorized to provide a service on a monopoly basis, these limitations on municipal action will not hobble the execution of legitimate governmental programs." *Id.*, at 416–417 (footnote omitted).

The judgment of the Court of Appeals is reversed, and the action is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE took no part in the consideration or decision of this case.

---

against government defendants. As we said in *City of Lafayette*, "[i]t may be that certain activities which might appear anticompetitive when engaged in by private parties, take on a different complexion when adopted by a local government." 435 U. S., at 417, n. 48. Compare, *e. g.*, *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 687–692 (1978) (considering the validity of anticompetitive restraint imposed by private agreement), with *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 133 (1978) (holding that anticompetitive effect is an insufficient basis for invalidating a state law). Moreover, as in *City of Lafayette*, *supra*, at 401–402, we do not confront the issue of remedies appropriate against municipal officials.

JUSTICE STEVENS, concurring.

The Court's opinion, which I have joined, explains why the city of Boulder is not entitled to an exemption from the antitrust laws. The dissenting opinion seems to assume that the Court's analysis of the exemption issue is tantamount to a holding that the antitrust laws have been violated. The assumption is not valid. The dissent's dire predictions about the consequences of the Court's holding should therefore be viewed with skepticism.[1]

In *City of Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, we held that municipalities' activities as providers of services are not exempt from the Sherman Act. The reasons for denying an exemption to the city of Lafayette are equally applicable to the city of Boulder, even though Colorado is a home-rule State. We did not hold in *City of Lafayette* that the city had violated the antitrust laws. Moreover, that question is quite different from the question whether the city of Boulder violated the Sherman Act because the character of their respective activities differs. In both cases, the violation issue is separate and distinct from the exemption issue.

A brief reference to our decision in *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579, will identify the invalidity of the dissent's assumption. In that case, the Michigan Public Utility Commission had approved a tariff that required the Detroit Edison Co. to provide its customers free light bulbs. The company contended that its light bulb distribution program was therefore exempt from the antitrust laws on the authority of *Parker* v. *Brown*, 317 U. S. 341. See 428 U. S., at

---

[1] Cf. *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579, 615 (Stewart, J., dissenting) (the Court's holding "will surely result in disruption of the operation of every state-regulated public utility company in the Nation and in the creation of 'the prospect of massive treble damage liabilities' ") (quoting Posner, The Proper Relationship Between State Regulation and the Federal Antitrust Laws, 49 N. Y. U. L. Rev. 693, 728 (1974)). See also *United States Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 176, n. 10.

592.  The Court rejected the company's interpretation of *Parker* and held that the plaintiff could proceed with his antitrust attack against the company's program.  We surely did not suggest that the members of the Michigan Public Utility Commission who had authorized the program under attack had thereby become parties to a violation of the Sherman Act.  On the contrary, the plurality opinion reviewed the *Parker* case in great detail to emphasize the obvious difference between a charge that public officials have violated the Sherman Act and a charge that private parties have done so.[2]

It would be premature at this stage of the litigation to comment on the question whether petitioner will be able to establish that respondents have violated the antitrust laws.  The

---

[2] See 428 U. S., at 585–592 (opinion of STEVENS, J.).  The point was made explicit in two passages of the plurality opinion.  In a footnote, the plurality stated:

"The cumulative effect of these carefully drafted references unequivocally differentiates between official action, on the one hand, and individual action (even when commanded by the State), on the other hand." *Id.*, at 591, n. 24.

The point was repeated in the text:

"The federal statute proscribes the conduct of persons, not programs, and the narrow holding in *Parker* concerned only the legality of the conduct of the state officials charged by law with the responsibility for administering California's program.  What sort of charge might have been made against the various private persons who engaged in a variety of different activities implementing that program is unknown and unknowable because no such charges were made." *Id.*, at 601 (footnote omitted).

The footnote omitted in the above quotation stated:

"Indeed, it did not even occur to the plaintiff that the state officials might have violated the Sherman Act; that question was first raised by this Court." *Id.*, at 601, n. 42.

See *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 361 ("[O]bviously, *Cantor* would have been an entirely different case if the claim had been directed against a public official or public agency, rather than against a private party").

answer to that question may depend on factual and legal issues that must and should be resolved in the first instance by the District Court. In accordance with my belief that "the Court should adhere to its settled policy of giving concrete meaning to the general language of the Sherman Act by a process of case-by-case adjudication of specific controversies," 428 U. S., at 603 (opinion of STEVENS, J.), I offer no gratuitous advice about the questions I think might be relevant. My only observation is that the violation issue is not nearly as simple as the dissenting opinion implies.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

The Court's decision in this case is flawed in two serious respects, and will thereby impede, if not paralyze, local governments' efforts to enact ordinances and regulations aimed at protecting public health, safety, and welfare, for fear of subjecting the local government to liability under the Sherman Act, 15 U. S. C. § 1 et seq. First, the Court treats the issue in this case as whether a municipality is "exempt" from the Sherman Act under our decision in *Parker* v. *Brown*, 317 U. S. 341 (1943). The question addressed in *Parker* and in this case is not whether state and local governments are *exempt* from the Sherman Act, but whether statutes, ordinances, and regulations enacted as an act of government are *pre-empted* by the Sherman Act under the operation of the Supremacy Clause. Second, in holding that a municipality's ordinances can be "exempt" from antitrust scrutiny only if the enactment furthers or implements a "clearly articulated and affirmatively expressed state policy," *ante*, at 52, the Court treats a political subdivision of a State as an entity indistinguishable from any privately owned business. As I read the Court's opinion, a municipality may be said to *violate* the antitrust laws by enacting legislation in conflict with the Sherman Act, unless the legislation is enacted pursuant to an affirmative state policy to supplant competitive market forces in the area of the economy to be regulated.

## I

Pre-emption and exemption are fundamentally distinct concepts. Pre-emption, because it involves the Supremacy Clause, implicates our basic notions of federalism. Pre-emption analysis is invoked whenever the Court is called upon to examine "the interplay between the enactments of two *different* sovereigns—one federal and the other state." Handler, Antitrust—1978, 78 Colum. L. Rev. 1363, 1379 (1978). We are confronted with questions under the Supremacy Clause when we are called upon to resolve a purported conflict between the enactments of the Federal Government and those of a state or local government, or where it is claimed that the Federal Government has occupied a particular field exclusively, so as to foreclose any state regulation. Where pre-emption is found, the state enactment must fall without any effort to accommodate the State's purposes or interests. Because pre-emption treads on the very sensitive area of federal-state relations, this Court is "reluctant to infer pre-emption," *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 132 (1978), and the presumption is that pre-emption is not to be found absent the clear and manifest intention of Congress that the federal Act should supersede the police powers of the States. *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 157 (1978).

In contrast, exemption involves the interplay between the enactments of a single sovereign—whether one enactment was intended by Congress to relieve a party from the necessity of complying with a prior enactment. See, *e. g.*, *National Broiler Marketing Assn.* v. *United States*, 436 U. S. 816 (1978) (Sherman Act and Capper-Volstead Act); *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 350–355 (1963) (Clayton Act and Bank Merger Act of 1960); *Silver* v. *New York Stock Exchange*, 373 U. S. 341, 357–361 (1963) (Sherman Act and Securities Exchange Act). Since the enactments of only one sovereign are involved, no problems of federalism are present. The court interpreting the

statute must simply attempt to ascertain congressional intent, whether the exemption is claimed to be express or implied. The presumptions utilized in exemption analysis are quite distinct from those applied in the pre-emption context. In examining exemption questions, "the proper approach . . . is an analysis which reconciles the operation of both statutory schemes with one another rather than holding one completely ousted." *Silver* v. *New York Stock Exchange, supra,* at 357.

With this distinction in mind, I think it quite clear that questions involving the so-called "state action" doctrine are more properly framed as being ones of pre-emption rather than exemption. Issues under the doctrine inevitably involve state and local regulation which, it is contended, are in conflict with the Sherman Act.

Our decision in *Parker* v. *Brown, supra,* was the genesis of the "state action" doctrine. That case involved a challenge to a program established pursuant to the California Agricultural Prorate Act, which sought to restrict competition in the State's raisin industry by limiting the producer's ability to distribute raisins through private channels. The program thus sought to maintain prices at a level higher than those maintained in an unregulated market. This Court assumed that the program would violate the Sherman Act were it "organized and made effective solely by virtue of a contract, combination or conspiracy of private persons, individual or corporate," and that "Congress could, in the exercise of its commerce power, prohibit a state from maintaining a stabilization program like the present because of its effect on interstate commerce." 317 U. S., at 350. In this regard, we noted that "[o]ccupation of a legislative field by Congress in the exercise of a granted power is a familiar example of its constitutional power to suspend state laws." *Ibid.* We then held, however, that "[w]e find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government

in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.*, at 350–351.

This is clearly the language of federal pre-emption under the Supremacy Clause. This Court decided in *Parker* that Congress did not intend the Sherman Act to override state legislation designed to regulate the economy. There was no language of "exemption," either express or implied, nor the usual incantation that "repeals by implication are disfavored." Instead, the Court held that state regulation of the economy is not necessarily pre-empted by the antitrust laws even if the same acts by purely private parties would constitute a violation of the Sherman Act. The Court recognized, however, that some state regulation is pre-empted by the Sherman Act, explaining that "a state does got give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful . . . ." *Id.*, at 351.

Our two most recent *Parker* doctrine cases reveal most clearly that the "state action" doctrine is not an exemption at all, but instead a matter of federal pre-emption.

In *New Motor Vehicle Bd. of California* v. *Orrin W. Fox Co.*, 439 U. S. 96 (1978), we examined the contention that the California Automobile Franchise Act conflicted with the Sherman Act. That Act required a motor vehicle manufacturer to secure the approval of the California New Motor Vehicle Board before it could open a dealership within an existing franchisee's market area, if the competing franchisee objected. By so delaying the opening of a new dealership whenever a competing dealership protested, the Act arguably gave effect to privately initiated restraints of trade, and thus was invalid under *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384 (1951). We held that the Act was outside the purview of the Sherman Act because it con-

templated "a system of regulation, clearly articulated and affirmatively expressed, designed to displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships." 439 U. S., at 109. We also held that a state statute is not invalid under the Sherman Act merely because the statute will have an anticompetitive effect. Otherwise, if an adverse effect upon competition were enough to render a statute invalid under the Sherman Act, "'the States' power to engage in economic regulation would be effectively destroyed.'" *Id.*, at 111 (quoting *Exxon Corp. v. Governor of Maryland*, 437 U. S., at 133). In *New Motor Vehicle Bd.*, we held that a state statute could stand in the face of a purported conflict with the Sherman Act.

In *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), we invalidated California's wine-pricing system in the face of a challenge under the Sherman Act. We first held that the price-setting program constituted resale price maintenance, which this Court has consistently held to be a *"per se"* violation of the Sherman Act. *Id.*, at 102–103. We then concluded that the program could not fit within the *Parker* doctrine. Although the restraint was imposed pursuant to a clearly articulated and affirmatively expressed state policy, the program was not actively supervised by the State itself. The State merely authorized and enforced price fixing established by private parties, instead of establishing the prices itself or reviewing their reasonableness. In the absence of sufficient state supervision, we held that the pricing system was invalid under the Sherman Act. 445 U. S., at 105–106.

Unlike the instant case, *Parker, Midcal*, and *New Motor Vehicle Bd.* involved challenges to a state statute. There was no suggestion that a State *violates* the Sherman Act when it enacts legislation not saved by the *Parker* doctrine from invalidation under the Sherman Act. Instead, the statute is simply unenforceable because it has been pre-empted by the Sherman Act. By contrast, the gist of the Court's

opinion is that a municipality may actually violate the antitrust laws when it merely enacts an ordinance invalid under the Sherman Act, unless the ordinance implements an affirmatively expressed state policy.[1]  According to the majority, a municipality may be liable under the Sherman Act for enacting anticompetitive legislation, unless it can show that it is acting simply as the "instrumentality" of the State.

Viewing the *Parker* doctrine in this manner will have troubling consequences for this Court and the lower courts who must now adapt antitrust principles to adjudicate Sherman Act challenges to local regulation of the economy.  The majority suggests as much in footnote 20.  Among the many problems to be encountered will be whether the "*per se*" rules of illegality apply to municipal defendants in the same manner as they are applied to private defendants.  Another is the question of remedies.  The Court understandably leaves open the question whether municipalities may be liable for treble damages for enacting anticompetitive ordinances which are not protected by the *Parker* doctrine.[2]

Most troubling, however, will be questions regarding the factors which may be examined by the Court pursuant to the Rule of Reason.  In *National Society of Professional Engi-*

---

[1] Most challenges to municipal ordinances undoubtedly will be made pursuant to § 1.  One of the elements of a § 1 violation is proof of a contract, combination, or conspiracy.  It may be argued that municipalities will not face liability under § 1, because it will be difficult to allege that the enactment of an ordinance was the product of such a contract, combination, or conspiracy.  The ease with which the ordinance in the instant case has been labeled a "contract" will hardly give municipalities solace in this regard.

[2] It will take a considerable feat of judicial gymnastics to conclude that municipalities are not subject to treble damages to compensate any person "injured in his business or property."  Section 4 of the Clayton Act, 15 U. S. C. § 15, is mandatory: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained."  See *City of Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 442–443 (1978) (BLACKMUN, J., dissenting).

*neers* v. *United States,* 435 U. S. 679, 695 (1978), we held that an anticompetitive restraint could not be defended on the basis of a private party's conclusion that competition posed a potential threat to public safety and the ethics of a particular profession. "[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." *Id.,* at 696. *Professional Engineers* holds that the decision to replace competition with regulation is not within the competence of private entities. Instead, private entities may defend restraints only on the basis that the restraint is not unreasonable in its effect on competition or because its procompetitive effects outweigh its anticompetitive effects. See *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36 (1977).

Applying *Professional Engineers* to municipalities would mean that an ordinance could not be defended on the basis that its benefits to the community, in terms of traditional health, safety, and public welfare concerns, outweigh its anticompetitive effects. A local government would be disabled from displacing competition with regulation. Thus, a municipality would violate the Sherman Act by enacting restrictive zoning ordinances, by requiring business and occupational licenses, and by granting exclusive franchises to utility services, even if the city determined that it would be in the best interests of its inhabitants to displace competition with regulation. Competition simply does not and cannot further the interests that lie behind most social welfare legislation. Although state or local enactments are not invalidated by the Sherman Act merely because they may have anticompetitive effects, *Exxon Corp.* v. *Governor of Maryland, supra,* at 133, this Court has not hesitated to invalidate such statutes on the basis that such a program would violate the antitrust laws if engaged in by private parties. See *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc., supra,* at 102–103 (resale price maintenance); *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384 (1951) (same). Cf. *Parker* v. *Brown,* 317 U. S., at 350

(Court assumed the stabilization program would violate the Sherman Act if organized and effected by private persons). Unless the municipality could point to an affirmatively expressed state policy to displace competition in the given area sought to be regulated, the municipality would be held to violate the Sherman Act and the regulatory scheme would be rendered invalid. Surely, the Court does not seek to require a municipality to justify every ordinance it enacts in terms of its procompetitive effects. If municipalities are permitted only to enact ordinances that are consistent with the procompetitive policies of the Sherman Act, a municipality's power to regulate the economy would be all but destroyed. See *Exxon Corp.* v. *Governor of Maryland*, 437 U. S., at 133. This country's municipalities will be unable to experiment with innovative social programs. See *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting).

On the other hand, rejecting the rationale of *Professional Engineers* to accommodate the municipal defendant opens up a different sort of Pandora's Box. If the Rule of Reason were "modified" to permit a municipality to defend its regulation on the basis that its benefits to the community outweigh its anticompetitive effects, the courts will be called upon to review social legislation in a manner reminiscent of the *Lochner* (*Lochner* v. *New York*, 198 U. S. 45 (1905)) era. Once again, the federal courts will be called upon to engage in the same wide-ranging, essentially standardless inquiry into the reasonableness of local regulation that this Court has properly rejected. Instead of "liberty of contract" and "substantive due process," the procompetitive principles of the Sherman Act will be the governing standard by which the reasonableness of all local regulation will be determined.[3] Neither the Due Process Clause nor the Sherman Act authorizes federal courts to invalidate

---

[3] During the *Lochner* era, this Court's interpretation of the Due Process Clause complemented its antitrust policies. This Court sought to compel competitive behavior on the part of private enterprise and generally for-

local regulation of the economy simply upon opining that the municipality has acted unwisely. The Sherman Act should not be deemed to authorize federal courts to "substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Ferguson* v. *Skrupa*, 372 U. S. 726, 730 (1963). The federal courts have not been appointed by the Sherman Act to sit as a "superlegislature to weigh the wisdom of legislation." *Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.*, 335 U. S. 525, 535 (1949).

Before this Court leaps into the abyss and holds that municipalities may *violate* the Sherman Act by enacting economic and social legislation, it ought to think about the consequences of such a decision in terms of its effect both upon the very antitrust principles the Court desires to apply to local governments and upon the role of the federal courts in examining the validity of local regulation of the economy.

Analyzing this problem as one of federal pre-emption rather than exemption will avoid these problems. We will not be confronted with the anomaly of holding a municipality liable for enacting anticompetitive ordinances.[4] The federal courts will not be required to engage in a standardless review of the reasonableness of local legislation. Rather, the question simply will be whether the ordinance enacted is pre-empted by the Sherman Act. I see no reason why a different rule of pre-emption should be applied to testing the validity of municipal ordinances than the standard we presently apply in assessing state statutes. I see no reason why a municipal ordinance should not be upheld if it satisfies the

---

bade government interference with competitive forces in the marketplace. See Strong, The Economic Philosophy of Lochner: Emergence, Embrasure and Emasculation, 15 Ariz. L. Rev. 419, 435 (1973).

[4] Since a municipality does not violate the antitrust laws when it enacts legislation pre-empted by the Sherman Act, there will be no problems with the remedy. Pre-empted state or local legislation is simply invalid and unenforceable.

*Midcal* criteria: the ordinance survives if it is enacted pursuant to an affirmative policy on the part of the city to restrain competition and if the city actively supervises and implements this policy.[5]   As with the case of the State, I agree that a city may not simply authorize private parties to engage in activity that would violate the Sherman Act.   See *Parker* v. *Brown*, 317 U. S., at 351.   As in the case of a State, a municipality may not become "a participant in a private agreement or combination by others for restraint of trade." *Id.*, at 351–352.

Apart from misconstruing the *Parker* doctrine as a matter of "exemption" rather than pre-emption, the majority comes to the startling conclusion that our federalism is in no way implicated when a municipal ordinance is invalidated by the Sherman Act.   I see no principled basis to conclude, as does the Court, that municipal ordinances are more susceptible to invalidation under the Sherman Act than are state statutes. The majority concludes that since municipalities are not States, and hence are not "sovereigns," our notions of federalism are not implicated when federal law is applied to invalidate otherwise constitutionally valid municipal legislation.   I find this reasoning remarkable indeed.   Our notions of federalism are implicated when it is contended that a municipal ordinance is pre-empted by a federal statute.   This Court has made no such distinction between States and their subdivisions with regard to the pre-emptive effects of federal law.

---

[5] The *Midcal* standards are not applied until it is either determined or assumed that the regulatory program would violate the Sherman Act if it were conceived and operated by private persons.   See *Parker* v. *Brown*, 317 U. S., at 350; *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 102–103 (1980).   A statute is not pre-empted simply because some conduct contemplated by the statute might violate the antitrust laws.   See *Joseph E. Seagram & Sons, Inc.* v. *Hostetter*, 384 U. S. 35, 45–46 (1966).   Conversely, reliance on a state statute does not insulate a private party from liability under the antitrust laws unless the statute satisfies the *Midcal* criteria.

The standards applied by this Court are the same regardless of whether the challenged enactment is that of a State or one of its political subdivisions. See, *e. g., City of Burbank* v. *Lockheed Air Terminal, Inc.*, 411 U. S. 624 (1973); *Huron Portland Cement Co.* v. *Detroit*, 362 U. S. 440 (1960). I suspect that the Court has not intended to so dramatically alter established principles of Supremacy Clause analysis. Yet, this is precisely what it appears to have done by holding that a municipality may invoke the *Parker* doctrine only to the same extent as can a private litigant. Since the *Parker* doctrine is a matter of federal pre-emption under the Supremacy Clause, it should apply in challenges to municipal regulation in similar fashion as it applies in a challenge to a state regulatory enactment. The distinction between cities and States created by the majority has no principled basis to support it if the issue is properly framed in terms of pre-emption rather than exemption.

As with the States, the *Parker* doctrine should be employed to determine whether local legislation has been preempted by the Sherman Act. Like the State, a municipality should not be haled into federal court in order to justify its decision that competition should be replaced with regulation. The *Parker* doctrine correctly holds that the federal interest in protecting and fostering competition is not infringed so long as the state or local regulation is so structured to ensure that it is truly the government, and not the regulated private entities, which is replacing competition with regulation.

## II

By treating the municipal defendant as no different from the private litigant attempting to invoke the *Parker* doctrine, the Court's decision today will radically alter the relationship between the States and their political subdivisions. Municipalities will no longer be able to regulate the local economy without the imprimatur of a clearly expressed state policy

to displace competition.[6] The decision today effectively destroys the "home rule" movement in this country, through which local governments have obtained, not without persistent state opposition, a limited autonomy over matters of local concern.[7] The municipalities that stand most to lose by the decision today are those with the most autonomy. Where the State is totally disabled from enacting legislation dealing with matters of local concern, the municipality will be defenseless from challenges to its regulation of the local economy. In such a case, the State is disabled from articulating a policy to displace competition with regulation. Nothing short of altering the relationship between the municipality and the State will enable the local government to legislate on matters important to its inhabitants. In order to defend itself from Sherman Act attacks, the home rule municipality will have to cede its authority back to the State. It is unfortunate enough that the Court today holds that our federalism is not implicated when municipal legislation is invalidated by a federal statute. It is nothing less than a novel and egregious error when this Court uses the Sherman Act to regulate the relationship between the States and their political subdivisions.

---

[6] The Court understandably avoids determining whether local ordinances must satisfy the "active state supervision" prong of the *Midcal* test. It would seem rather odd to require municipal ordinances to be enforced by the State rather than the city itself.

[7] Seeing this opportunity to recapture the power it has lost over local affairs, the State of Colorado, joined by 22 other States, has supported petitioner as *amicus curiae*. It is curious, indeed, that these States now seek to use the Supremacy Clause as a sword, when they so often must defend their own enactments from its invalidating effects.