R. Parker **GRIFFITH**, M.D. Plaintiff,

v.

The **HEALTH CARE AUTHORITY OF THE CITY OF HUNTSVILLE**, et al. Defendants.

CV No. 88-HM-5426-NE.

United States District Court, N.D. Alabama, Northeastern Division.

Jan. 25, 1989.

R. Wayne Wolfe, Huntsville, Ala., for plaintiff.

Linda Haddad, Susan Lapenta, Horty, Springer & Mattern, Pittsburgh, Pa., Lyman H. Harris, Birmingham, Ala., Roderick G. Steakley, Sirote, Permutt, McDermott, Slepian, Friend, Friedman, Held & Apolinsky, Huntsville, Ala., and James S. Roberts, Jr., Sirote, Permutt, McDermott, Slepian, Friend, Friedman, Held & Apolinsky, Birmingham, for defendants.

## MEMORANDUM OF DECISION

### HALTOM, District Judge.

The above entitled civil action brought by plaintiff R. Parker Griffith, M.D.[1] against defendants The Health Care Authority of the City of Huntsville d/b/a Huntsville Hospital, T. Alvin Blackwell, Charles E. Selah, M.D., Edward D. Boston, Ronald S. Owen (the Huntsville Hospital, T. Alvin Blackwell, Charles E. Selah, M.D., Edward D. Boston and Ronald S. Owen are hereinafter collectively called the "Huntsville Hospital defendants") and Marshall T. Schreeder, M.D., alleging violation by defendants of federal antitrust laws (Count 1, §§ 1 and 2 of Sherman Act, 15 U.S.C. §§ 1 and 2), violation by defendants of § 6–5–60, Code of Alabama 1975 (Count 2, monopolization, attempts to monopolize and a conspiracy to monopolize the market for the treatment of cancer patients by radiation/oncology), state law conspiracy violation by defendants to prevent plaintiff from exercising his lawful trade and calling by intentionally interfering with his practice of radiation/oncology and by further attempting to have him removed from the medical staff of the defendant hospital (Count 3),[2] violation by defendants of state law tort of intentional interference with a contractual relationship, i.e., interference with plaintiff's business and economic relationship with his past, current and prospective patients and with the community (Count 4), and violation by defendants of state law tort of outrageous conduct (Count 5), is before the Court upon the Rule 12(b)(1), Fed.R.Civ.P., motion to dismiss of the Huntsville Hospital defendants[3] following oral argument made of record by counsel of record for plaintiff and for such defendants at a special motion docket set, scheduled and held in this case on Friday, December 16, 1988 in the courtroom of the Federal Courthouse in Florence, Alabama.

## [JUDICIAL NOTICE]

The Court takes judicial notice that at all times herein relevant: [i] the defendant The Health Care Authority of the City of Huntsville is and was an Alabama public corporation originally incorporated and organized with the consent of the governing body of the City of Huntsville, Alabama under the name of "The Hospital Building Authority of the City of Huntsville" and pursuant to and in conformity with Act No. 109 enacted in the 1961 Regular Session of the Alabama Legislature, by Certificate of Incorporation filed in the Office of the

---

1. ¶ 4 of the complaint alleges that plaintiff R. Parker Griffith is a board certified radiation/oncologist licensed to practice medicine in the State of Alabama who has engaged in the practice of his specialty in Huntsville, Alabama from 1975 to the present time.

2. Despite this allegation Dr. Griffith admittedly has retained his membership on the medical staff of the Huntsville Hospital and there are no discernable "peer review" issues in this case.

3. The Court has treated and considered the motion to dismiss of the Huntsville Hospital defendants as a motion under Fed.R.Civ.P. 12(b)(1). Use of extrinsic evidence is permissible in a motion under Fed.R.Civ.P. 12(b)(1) but not under Fed.R.Civ.P. 12(b)(6) unless the court converts the motion into one for summary judgment with notice to the parties.

Judge of Probate of Madison County, Alabama on August 3, 1961, as amended by certificate of amendment filed of March 8, 1979; [ii] that with the further consent of the governing body of the City of Huntsville the Authority was subsequently reincorporated as a health care authority (and public corporation) under Acts 1982 No. 82–418, p. 629 enacted at the 1982 Regular Session of the Legislature of Alabama, § 22–21–310, *et seq.*, Code of Alabama, 1975, as amended ["The Health Care Authorities Act of 1982"], by Certificate of Reincorporation filed in the Office of the Judge of Probate of Madison County, Alabama on April 14, 1986; and [iii] that since April 14, 1986 the defendant The Health Care Authority of the City of Huntsville has been continuously and is now solely organized, solely existing and governed exclusively by above referenced Act No. 82–418 insofar as the subject matter and content of Act No. 82–418 is concerned.

### [STIPULATION OF PARTIES]

Counsel of record for plaintiff and the Huntsville Hospital defendants orally stipulated of record at the above referenced special motion docket that at all times relevant herein: [i] the defendant T. Alvin Blackwell served and acted and now serves and acts as the chairman of the Board of Directors of The Health Care Authority of the City of Huntsville d/b/a Huntsville Hospital; [ii] the defendant Charles E. Selah, M.D., served and acted and now serves and acts as a member of the Board of Directors of the Huntsville Hospital; [iii] the defendant Edward D. Boston served and acted and now serves and acts as the Chief Executive Officer of the Huntsville City Hospital; [iv] the defendant Ronald S. Owen served and acted and now serves and

acts as the Executive Vice President of the Huntsville Hospital; and [v] that the acts of defendants Blackwell, Selah, Boston and Owen about which plaintiff herein complains were actions taken by such defendants in their respective official capacities above referenced.

### [FEDERAL LAW ISSUES TO BE RESOLVED]

(1) Whether the defendant The Health Care Authority of the City of Huntsville d/b/a Huntsville Hospital is a "local government" within the meaning of the Local Government Antitrust Act of 1984 [§§ 2–4, 15 U.S.C. §§ 34–36] and is therefore absolutely immune from damages sought by plaintiff under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2?

(2) Whether the defendants Blackwell, Selah, M.D., Boston and Owen in their respective official capacities above referenced are shielded from liability for damages against plaintiff's antitrust claims under 15 U.S.C. Section 35(a) which provides in relevant part, that "[n]o damages ... may be recovered ... from any local government, or official or employee thereof acting in an official capacity" and/or under 15 U.S.C. Section 36(a) which provides immunity from damages for any person when the claim is "based on any official action directed by a local government, or official or employee thereof acting in an official capacity"?

(3) Whether the Huntsville Hospital defendants are exempt from federal antitrust liability, including antitrust claim for injunctive relief, under the state action doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)[4]?

---

4. In *Parker,* a raisin producer filed an action against a California state official to enjoin enforcement of the state's Agricultural Prorate Act, which created a program "to restrict competition among the growers [of raisins] and maintain prices in the distribution of their commodities to packers." Recognizing that the state's program was anticompetitive, the Supreme Court nevertheless found no violation of federal antitrust law, concluding that "nothing in the language of the Sherman Act or in its history ... suggests that its purpose was to restrain a state or its officers from activities directed by its legislature." Thus, the Court interpreted the Sherman Act as not prohibiting states from imposing restraints on competition. This interpretation of the Sherman Act is what is known as the state action doctrine. Although *Parker* involved a suit against a state official, the Supreme Court subsequently recognized that the state action exemption may also apply in a suit against a private party. See, e.g., *Southern Motor Carriers Rate Conference, Inc. v. United*

[DISCUSSION]

As previously noted, The Health Care Authority of the City of Huntsville was reincorporated on April 14, 1986 pursuant to and in conformity with The Health Care Authorities Act of 1982 [§ 22–21–310 *et seq.*, Code of Alabama 1975, as amended]. Since the date of reincorporation, its organization, existence and right, power and authority have been governed by the provisions of that Act. So it is today.

Section 22–21–318, 1975 Code, as amended, provides in pertinent part:

(a) In addition to all other powers granted elsewhere in this article, and subject to the express provisions of its certificate of incorporation, an authority shall have the following powers, together with all powers incidental thereto or necessary to the discharge thereof in corporate form:

[Powers 1–30, inclusive, omitted]

(31) To exercise all powers granted hereunder in such manner as it may determine to be consistent with the purposes of this article, notwithstanding that as a consequence of such exercise of such powers it engages in activities that may be deemed "anticompetitive" within the contemplation of the antitrust laws of the state or of the United States; and

[Power 32 omitted]

[Legislative Declaration (b)(1) and (b)(2) omitted]

(c) As a basis for the power granted in subdivision (31) of the preceding subsection (a), the legislature hereby:

(1) Recognizes and contemplates that the nature and scope of the powers conferred on authorities hereunder are such as may compel each authority, in the course of exercising its other powers or by virtue of such exercise of such powers, to engage in activities that may be characterized as "anticompetitive" within the contemplation of the antitrust laws of the state or of the United States; and

(2) Determines, as an expression of the public policy of the state with respect to the displacement of competition in the field of health care, that each authority, when exercising its powers hereunder with respect to the operation and management of health care facilities, acts as an agency or instrumentality of its authorizing subdivisions and as a political subdivision of the state.

[subsection (d) omitted]

The Court here notes of record that the Certificate of Reincorporation of The Health Care Authority of The City of Huntsville (filed April 14, 1986) in no manner limits or restricts the powers conferred upon the Authority by the provisions of § 22–21–318 and that the Authority possesses the extraordinary power of authority conferred by § 22–21–319.[5] Thus, we see that from April 14, 1986 to the present date The Health Care Authority of the City of Huntsville has been expressly authorized by the Alabama statutory law under which it was reincorporated and thereafter existed to engage in anticompetitive conduct in the course of carrying out its delegated health care responsibilities as an agency or instrumentality of its authorizing subdivision, the City of Huntsville, Alabama, and as a political subdivision of the State of Alabama.

Associate Justice Lewis F. Powell, Jr. (retired), speaking for the United States Court of Appeals For the Fourth Circuit in *Sandcrest Outpatient Services v. Cumberland County Hospital System, Inc.*, 853 F.2d 1139, 1142 (4th Cir.1988), gives the federal bench and bar the following history of the Local Antitrust Act of 1984, 15 U.S.C. § 34, *et seq.:*

Congress enacted the Local Government Antitrust Act of 1984, 15 U.S.C. § 34, *et seq.*, ("LGAA" or the "Act") in order to broaden the scope of antitrust immunity applicable to local governments. This was a response to the filing

*States,* 471 U.S. 48, 58–59, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1985).

5. The same power of eminent domain as is possessed by the City of Huntsville with limitation not here pertinent.

of "an increasing number of antitrust suits, and threatened suits, that could undermine a local government's ability to govern in the public interest." H.R.Rep. No. 965, 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S.Code Cong. & Admin. News 4602, 4603. [footnote omitted] The Report of the Senate Committee on the Judiciary, in considering the problem of antitrust suits facing local governments, noted that:

> More than one hundred Federal antitrust suits seeking treble damages are now pending against cities, counties, townships and virtually every other type of local government. Dozens of local government activities are being challenged, ranging from zoning decisions to the regulation of garbage collection, airport concessions, and parking lots.

S.Rep. No. 593, 98th Cong., 2d Sess. 2 (1984). The Senate Report concluded that it was necessary to enact a statute that would "allow local governments to go about their daily functions without the paralyzing fear of antitrust lawsuits...." *Id.* at 3. Both the House and the Senate, however, were careful to observe that the immunity being provided to local governments was immunity from suits for damages, and not immunity from suits seeking injunctive relief. *See id.* at 5–6; H.R.Rep. No. 965, 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4602, 4603.

It was in the light of the above purpose that, in 1984, Congress enacted 15 U.S.C. §§ 34–36. Section 35(a) provides, in relevant part, that "[n]o damages ... may be recovered ... from any local government, or official or employee thereof acting in an official capacity." Section 36(a) provides immunity from damages for any person when the claim is "based on any official action directed by a local government, or official or employee thereof acting in an official capacity." ....

853 F.2d at 1142.

In *Sandcrest* the issue squarely presented was whether the district court erred in granting summary judgment in favor of appellees Cumberland County Hospital System, Inc.,[6] Sun Health Management Corporation (corporate manager of the Cape Fear Medical Center since the fall of 1985), John Briggs (Chief of Staff of the Cape Fear Medical Center, a county hospital owned and operated by Cumberland County Hospital System, Inc.), and four other staff physician defendants comprising an appointed ad hoc committee on the question whether they were entitled to immunity from damages pursuant to the Local Government Antitrust Act of 1984. The facts of the case are these:

> Appellant, Sandcrest Outpatient Services, P.A. ("Sandcrest"), is a professional association of emergency room physicians that, from March 1, 1981 until February 28, 1986, provided physician services for the emergency room at Cape Fear Valley Medical Center (the "Medical Center").... [footnote omitted] The Hospital System is a nonprofit corporation that was created, pursuant to North Carolina law, to act as an agency and instrumentality of Cumberland County in operating county-owned hospitals. [statutory citation omitted] On December 11, 1985, John Plyler, the director of the Medical Center and the representative of Sun-Health Management Corporation ("Sun-Health")—a corporation that had managed the Medical Center since the fall of 1985—announced at an executive session of the hospital's Board of Trustees that the Sandcrest contract would not be renewed when it expired on February 28, 1986. A discussion followed, and the next day Plyler informed Sandcrest that its contract would not be renewed. On January 20, 1986, in response to the presentation of a petition signed by 25% of the active medical staff, Dr. Briggs, the Chief of Staff of the Medical Center and a member of the Board of Trustees of the Hospital Sys-

---

**6.** The Cumberland County Hospital System, Inc. is a nonprofit corporation that was created, pursuant to North Carolina law, to act as an agency and instrumentality of Cumberland County in operating county-owned hospitals.

tem, called a special meeting of the medical staff as required by the Medical Staff Bylaws. At the meeting, Briggs explained that the Sandcrest contract would not be renewed and that several emergency room groups had submitted proposals. He advised that an *ad hoc* committee of staff physicians had been appointed to examine the various bids that had been submitted.

On January 22, 1986, two days after the staff meeting, the hospital executed an agreement with Coastal Emergency Services, Inc. for the provision of emergency room services for three years, commencing March 1, 1986. On November 10, 1986, Sandcrest filed this action alleging that appellees—the Hospital System, SunHealth, Dr. Briggs and the members of the *ad hoc* committee—had violated Section 1 of the Sherman Act and Section 75—1 of the North Carolina Unfair And Deceptive Trade Practices Act by engaging in a conspiracy to restrain trade. Specifically, appellant alleged that appellees engaged in a group boycott against it, and that they refused to deal with it as a part of a conspiracy to prevent the renewal of its contract to provide physician services to the emergency room at the Medical Center. Sandcrest's complaint sought damages and reasonable attorney's fees and costs.

Appellees filed motions to dismiss under Rule 12(b)(1) and (6), asserting that the complaint failed to allege a sufficient nexus between the alleged conspiracy and its impact on interstate commerce. Sandcrest filed a motion to amend the complaint to add additional allegations regarding a nexus with, and effect on, interstate commerce. Appellees subsequently filed a joint motion for summary judgment asserting, *inter alia,* immunity from suit pursuant to the Local Government Antitrust Act of 1984.

853 F.2d at 1141

Noting that the appellant had not appealed the district court's determination that the Cumberland County Hospital System, Inc. was a local governmental unit, the Fourth Circuit thereupon assumed on the antitrust question that the Hospital System was a governmental unit and in that light only proceeded to address whether the district court correctly concluded that the other appellees were also entitled to immunity under the Act. Finding that the appellee SunHealth Management Corporation (the corporate manager of the Medical Center), acting through its employee Plyler, was entitled to immunity from damages as a "person" engaged in "official action directed by a local government, or official or employee thereof acting in an official capacity," 15 U.S.C. § 36(a), Associate Justice Powell wrote:

In interpreting the meaning of the phrase "directed by a local government, or official or employee thereof," we are guided by the statement of the Conference Report to the Local Government Antitrust Act. The Report, explicitly agreed to by both houses of Congress, explains that the phrase "official action directed by" found in *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943) and subsequent cases interpreting it, "shall apply by analogy to the conduct of a local government in directing the actions of nongovernmental parties, as if the local government were a state." H.R.Cong.Rep. No. 1158, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S. Code Cong. & Admin.News 4602, 4627.

In determining whether anticompetitive conduct engaged in by private parties should be entitled to immunity, the Supreme Court has held that "the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy,'" *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1978) (opinion of Brennan, J.)), and the anticompetitive conduct "must be 'actively supervised' by the State itself." *Id.* (quoting *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. [389] at 410, 98 S.Ct. [1123] at 1135 [55 L.Ed.2d 364 (1978)]). The Court has held that to satisfy the "clear articulation" requirement of the state action test it is sufficient if the provisions in question plainly show that the legislature con-

templated the kind of action complained of. *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 44, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985). Explicit authorization is not required. *Id.* To satisfy the active supervision prong of the test, it is necessary only for the State to exercise ultimate control over the challenged anticompetitive conduct. *Patrick v. Burget,* —— U.S. ——, 108 S.Ct. 1658, 1668, 100 L.Ed.2d 83 (1988). In other words, this prong of the test requires that "state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Id.*

We find that Plyler's action on behalf of SunHealth meets both prongs of this test....

853 F.2d at 1143.

From this point in the opinion Mr. Justice Powell clearly enunciated why Dr. Briggs, another appellee and Chief of Staff of the hospital and a member of the Board of Trustees, was clearly an employee of a local government, thus possessing immunity under the LGAA. Answering appellant's argument that the Medical Center's bylaws did not affirmatively grant the Chief of Staff "the independent responsibility from making any decisions or recommendations regarding the delivery of medical care at the hospital," the Fourth Circuit rejoined that in view of the broad authority necessarily granted the Chief of Staff, it would be unreasonable to assume that he could act only pursuant to express authorization. Moreover, wrote the *Sandcrest* court:

Our position that an affirmative grant of explicit authority is not required for an employee or government official to be acting in an official capacity under the LGAA is consistent with the position taken by the Second Circuit. *See Montauk–Caribbean Airways, Inc. v. Hope,* 784 F.2d 91, 94 (2d Cir.1986). The Second Circuit based its conclusion on a finding that, in light of the legislative history, Congress intended that the phrase "acting in an official capacity" be given broad meaning. *Id.* We believe that on

its face, the phrase "acting in an official capacity" includes those lawful actions, undertaken in the course of a defendant's performance of his duties, that reasonably can be construed to be within the scope of his duties and consistent with the general responsibilities and objectives of his position. This interpretation is also supported by the legislative history. (footnote omitted)

In the instant case, Briggs merely set up an *ad hoc* committee to review, assess, and recommend to the Board of Trustees a final disposition on the awarding of a contract to an emergency room service group. Moreover, appellant's various complaints allege that Briggs' appointment of an *ad hoc* committee was carried out "in combination with the Board of Trustees." (App. at 7, 52, 173). Significantly, neither Briggs nor the *ad hoc* committee made a final decision on the awarding of the contract with Coastal Emergency Services, Inc. on January 22, 1986. (App. at 313). We conclude that Briggs' conduct was well within the scope of his official responsibilities as the chief administrative officer of the medical staff. No genuine issue of material fact exists to justify the denial of summary judgment on this question.

853 F.2d at 1145.

Finally, the *Sancrest* court addressed the issue of antitrust immunity for the appellee members of the *ad hoc* committee writing:

The members of the *ad hoc* committee are appellees in this case based solely on the fact that they served on the committee. Appellant argues first that these private doctors are not entitled to summary judgment on the issue of immunity under Section 36 because their appointment to the committee was unauthorized. Appellant also contends that there is a factual issue as to whether the committee's activities were taken pursuant to a clearly articulated government policy with active supervision by the local government, an official, or an employee of the local government. We find these contentions to be without merit. (see footnote 8 at end of this quote).

As discussed previously, Dr. Briggs was acting in his official capacity when he appointed the members of the *ad hoc* committee, and appellant has alleged that the Board of Trustees participated in setting up such a committee. (Reference omitted) Also, this committee's function was purely advisory. It is clear that the Board of Trustees possessed the power to supervise and review the work of the *ad hoc* committee, and, in fact, the Board actively exercised that power by approving the recommendation of the committee at its meeting on January 22, 1986. (App. at 313).

Appellant argues finally on this issue that there is a factual dispute as to "whether the private defendants exerted so much influence on the Board of Trustees ... that the decision not to renew Sandcrest and to employ Coastal can be seen as effectively those of the private defendants." Appellant's Brief at 33. But appellant's initial complaint and the first and second amended complaints explicitly allege that the members of the *ad hoc* committee, "*acting in combination with the Board of Trustees*, Briggs and Plyler, secretly determined not to renew Sandcrest's contract...." (App. at 8, 52, 173) (emphasis added). The complaints are devoid of any allegation that the private defendants controlled the decision of the Board of Trustees, and the record contains no evidence from which it could be inferred that the *ad hoc* committee exercised undue influence over the Board of Trustees.

The district court properly granted summary judgment on the issue of immunity as to all appellees.

853 F.2d at 1145–46.

[853 F.2d at 1146, n. 8]

As with SunHealth, we need not determine whether the individual doctors who made up the *ad hoc* committee were officials or employees of the county because the immunity provided by Section 4 of the LGAA is dispositive.

With knowledge that its quotes from *Sandcrest* have been far too lengthy, this Court has the temerity to call to the attention of counsel of record for the parties and to the members of the federal bench and bar in general Mr. Justice Powell's most excellent rejoinder to appellant's final argument on the issue of immunity for Sun-Health, Briggs and the *ad hoc* committee members:

Appellant makes a final argument on the issue of immunity for SunHealth, Briggs, and the *ad hoc* committee members. It argues that, even if appellees' conduct may be considered in a technical sense to have been undertaken within the scope of their authority and under adequate supervision, the LGAA does not protect them. Appellant insists that appellees were participants in an unauthorized conspiracy, and therefore, in reality, their actions were unauthorized and outside the scope of the LGAA's protection.

If this view were accepted, the fundamental purpose underlying the LGAA's immunity provisions would be substantially undercut. (Reference omitted) The basic actions challenged by appellant were the failure to renew its contract to provide emergency room services and the selection of a competitor to provide such services. It must be conceded that hospitals lawfully may make management decisions of this kind, and that the making of such decisions are within the scope of authority of the hospital and its board of trustees. Appellant's argument that allegations of a conspiracy convert otherwise authorized conduct into unauthorized conduct would require consideration of whether the subjective motives or intentions of appellees were to benefit themselves rather than the hospital. The LGAA makes no provision for consideration of a defendant's motives, and an allegation that an act was done pursuant to a conspiracy is akin to an allegation that it was done in bad faith or with malice. *Cf. Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir.1987) (claim that a probation officer prepared a false presentence report was properly dismissed on grounds of immunity).

853 F.2d at 1146.

While the Court's research has produced no Eleventh Circuit Court of Appeals case or cases definitively construing the antitrust immunity from damages granted local governments by the Local Government Antitrust Act of 1984, it is noted that this issue was presented in *Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority*, 801 F.2d 1286 (11th Cir.1986), but not decided because the state action immunity defense made such determination unnecessary. *Id.* at 1291.

The United States District Court for the Central District of California determined that a hospital district was a "local government" within the meaning of the Local Government Antitrust Act of 1984 and therefore was absolutely immune from damages sought under the Clayton Act (Clayton Act § 4, 15 U.S.C. § 15) in *Palm Springs Medical Clinic, Inc. d/b/a Palm Springs Medical Center v. Desert Hospital, et al.*, 628 F.Supp. 454 (C.D.Calif.1986). The facts of this California case are stated by United States District Judge Rymer as follows:

> This is an action by Palm Springs Medical Clinic, Inc., doing business as Palm Springs Medical Center ("PSMC"), against Desert Hospital ("Desert"); Peter Tynberg, M.D.; and Charles J. Supple, M.D. PSMC is a private corporation providing medical services in the Palm Springs, California area (Complaint ¶ 4). Tynberg is Chief of Staff and Chairman of the Medical Executive Committee at Desert and a member of Eisenhower Medical Center ("EMC"), another general hospital in the Palm Springs area that directly competes with PSMC (*id.* ¶ 5). Supple is a member of the medical staff at Desert and a principal beneficiary of the Sunrise Associates Trust, the owner-lessor of the land upon which PSMC's main office is located (*id,* ¶ 6).

> PSMC alleges that Desert, Tynberg, and Supple conspired to injure PSMC and eliminate it as a competitive provider of medical services in the Palm Springs area (*id.* ¶ 14). Specifically, PSMC alleges that the defendants hindered the initial credentialing of PSMC physicians at Desert and EMC; hindered the granting of staff privileges to PSMC physicians at Desert and EMC; interfered with PSMC's efforts to recruit new physicians; arranged for Desert to purchase the land and buildings of PSMC's main office on "sweetheart terms" in order to injure PSMC and enable Desert to establish its own facilities; induced suppliers of PSMC to reduce the availability of equipment or credit in the purchase of equipment; spread false rumors designed to lower consumer confidence in PSMC; and disparaged the services PSMC provided in the Palm Springs area (*id.* ¶ 14).

> 628 F.Supp. at 455.

PSMC brought the following federal claims: conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, entitling PSMC to damages, costs and attorney's fees under Section 4 of the Clayton Act, 15 U.S.C. § 15; attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, entitling PSMC to damages, costs and attorney's fees under Section 4 of the Clayton Act; conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, entitling PSMC to damages, costs and attorney's fees under Section 4 of the Clayton Act; and injunctive relief pursuant to Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act, 15 U.S.C. § 26. PSMC also brought the following state claims: trust in restraint of trade in violation of the Cartwright Act, Cal.Bus. & Prof.Code §§ 16700 *et seq.;* defamation; intentional and negligent interference with prospective business advantage; and unfair competition in violation of Cal.Bus. & Prof.Code §§ 17200 *et seq.* These pendent claims constitute PSMC's fifth, sixth, seventh, and eighth counts in the Complaint.

The defendants Desert and Tynberg moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) and for a more definite statement under Fed.R.Civ.P. 12(e). Desert's basis for dismissal was that it was a "local government" within the meaning of the Local Government Antitrust Act of 1984 and therefore absolutely immune from damage liability under the Clayton

Act. In conjunction with its Rule 12(b)(1) motion Desert introduced evidence showing that it was a hospital district within the meaning of the California Health & Safety Code.

Desert argued that, as a hospital district, it came under the 1984 Act's definition of "local government" and was thus entitled to the protections of the 1984 Act. Desert made this argument on the legislative history of the Act and the manner of creation and regulation of hospital districts by the California Health & Safety Code. PSMC did argue that (1) neither the Act nor the legislative history explicitly included hospital districts in the list of "local governments"; (2) no case had applied the 1984 Act to a hospital district; and (3) Desert was attempting to become an independent hospital even at the time it sought refuge under the 1984 Act as a "local government." The District Court summarily rejected these arguments holding: (1) that the provisions of the Act and legislative history cited by Desert in its 12(b)(1) motion were explicitly inclusive, not exclusive, in language and thus might include hospital districts in the definition of "local governments"; (2) no case *had reached* the question of whether hospital districts came under the 1984 Act; and (3) Desert's future intentions were irrelevant to its present status for purposes of the 1984 Act. The Court thereupon accepted Desert's contention that it was a "special function governmental unit" for purposes of the 1984 Act. The California district court further rejected PSMC's argument that the Act did not reach Sherman Act claims since it was directed only to the Clayton Act, holding that when damages are sought through Section 4 of the Clayton Act, it made no difference whether the underlying violation was of Sections 1 or 2 of the Sherman Act or Clayton Act claims. Further answering PSMC's assertion that the 1984 Act conferred only a restricted immunity upon local governments rather than the absolute immunity urged by Desert and that Desert could not have engaged in "official conduct" in the case given the egregious nature of the alleged violations, the California district court commenced this particular inquiry into the proper interpretation of the Act by looking first to the statutory language and concluded that if Congress had intended that local governments have immunity only for actions taken in an official capacity it would have so indicated by express language. The court thereupon determined that the legislative history of the Act [quoted extensively by the *Desert* court] supported its conclusion that local governments have absolute immunity under the 1984 Act, noting that the Act was passed in response to *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), in which the Supreme Court held that a state's grant of home-rule powers to a municipality was insufficient authorization by the state to cloak the municipality in state action immunity under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Concluding and holding that Desert was immune from suit for damages under the Clayton Act the court dismissed counts 1, 2 and 3 (each for Clayton Act damages) as against Desert.

While the *Desert* court declined to accept defendant Tynberg's (Chief of Staff and Chairman of the Executive Committee at Desert) invitation extended to the court during oral argument to require PSMC to provide a more definite statement so that Tynberg could determine immediately whether he also was immune from damages under the Local Government Antitrust Act of 1984, the court did note that Tynberg's alleged actions could come under two areas of the 1984 Act,[7] thus cloaking Tynberg with absolute immunity from antitrust damages.

After consideration and discussion of plaintiff's pendent claims [628 F.Supp. at pp. 465–466], the *Desert* court thereupon ordered as follows: (1) Desert's motion to

---

7. First, said the *Desert* court, Tynberg could be considered an "official or employee ... acting in an official capacity", 1984 Act § 3(a). Second, he could be considered, said the court, "a person" whose actions were "based on any official action directed by a local government, or official or employee acting in an official capacity." *Id.* § 4(a).

dismiss based on the 1984 Local Government Antitrust Act was granted; (2) Tynberg's motion for more definite statement was denied; and (3) plaintiff's pendent claims for violation of the Cartwright Act, defamation, intentional and negligence interference with prospective business advantage and unfair competition were dismissed without prejudice to the merits.

The case of *Montauk–Caribbean Airways, Inc. v. Hope*, 784 F.2d 91 (2nd Cir. 1986), wherein the principal argument raised on appeal was whether the Local Government Antitrust Act of 1984 or the state action doctrine, or both, barred appellant's antitrust action against a municipality which owned and operated a local airport, is instructive and persuasive in connection with the efforts of this Court to properly resolve these same issues in the present case. There Montauk–Caribbean Airways, Inc. ("Montauk") commenced its action on February 8, 1985 against members of the Town Board of East Hampton, New York; the Town's attorney; the manager of the Town's airport; East Hampton Aire, Inc. ("EHA"), a competitor airline; and the latter's executive officer. The complaint alleged violations of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982); the Clayton Act, 15 U.S.C. §§ 15, 26 (1982); the Federal Aviation Act, 49 U.S.C.App. §§ 1305(a), 1349(a), 2210(a) (1982); and the Federal Civil Rights, 42 U.S.C. § 1983 (1982). The complaint also alleged pendent state claims for breach of contract and conspiracy. The action was based on the Town's refusal to allow Montauk to serve as an air carrier and fixed-base operator at the East Hampton Airport on a year-round basis. Montauk alleged that the Town and EHA conspired to create a monopoly during the off-season months for the benefit of EHA. In an order dated May 28, 1985 the district court, pursuant to Fed.R.Civ.P. 12(b)(6), dismissed the Clayton Act,[8] § 1983 and Federal Aviation Act claims. After the Supreme Court's decision in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the district court dismissed Montauk's Sherman Act

claim for injunctive relief and the pendent state law claims, and reaffirmed dismissal of the § 1983 claim. Montauk's appeal followed. Writing first to the Local Government Antitrust Act immunity from damages issue, the *Montauk* court stated:

> The complaint alleged that appellees Town and EHA conspired to restrain trade and create a monopoly in favor of EHA in violation of the Clayton and Sherman Acts. Appellant submitted to the Town Board a proposed lease amendment which provided for the elimination of any seasonal restriction on appellant's operation. The Board held a public hearing but reached no formal decision. The lease has not been modified. Appellant argues that EHA has usurped a significant share of appellant's air carrier business.

Judge Bramwell held that the Act barred appellant's antitrust claim for treble damages under the Clayton Act. The Act insulates municipalities and their representatives from monetary claims arising under the antitrust laws. This recently enacted statute provides:

> "No damages, interest on damages, costs, or attorney's fees may be recovered under section 15, 15a, or 15c of this title from any local government, or official or employee thereof acting in an official capacity."

Congress enacted this statute prior to the Supreme Court's decision in *Hallie*. Its legislative history reflects the desire of Congress to broaden the shield protecting municipalities from antitrust claims for damages. The statute was enacted, in part, "in response to concern with Supreme Court decisions over the past few years that appear to have limited the extent that antitrust immunity applicable to States will be accorded to local governments." H.R.Rep. No. 98–965, 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4602, 4603. Thus, it is fair to assume that Congress intended greater protection for

---

**8.** The district court dismissed the Clayton Act claims for damages on the basis of the Local

Government Antitrust Act of 1984, 15 U.S.C. § 35 (Supp. II 1984).

municipalities than the parameters of the pre-Hallie *state action doctrine provided.*

Appellant argues, however, that, in the absence of an articulated state authorization for the town board members' conduct, appellees were not acting "in an official capacity", and therefore fall outside the protection of the Act. This narrow interpretation, which would provide no greater protection than that which the federal common law afforded, is not what Congress intended.

The legislative history of the Act indicates that Congress, concerned with the number of antitrust actions brought against municipalities and the limited immunity available under the then-existing state action exemption, intended that the phrase "acting in an official capacity" be given broad meaning. An affirmative grant of authority is not required.

> "The definition of official local conduct is intended to be as broad as the local government's authority—encompassing 'legislative, regulatory, executive, administrative, or judicial authority' of a local government. The Committee assumes that this authority will most often stem from broad home rule grants, or from more specific State grants of authority to the local entity. The definition thus removes any requirement imposed by the Supreme Court in *Community Communications Co. v. City of Boulder,* [455 U.S. 389 (1978)] that there be a specific and affirmative grant of a State's authority to the local government in every instance."

H.R.Rep. No. 98–965, 98th Cong., 2d Sess. 20–21, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4602, 4621–22.

In light of the desire of Congress to grant broad immunity from damages for noncriminal acts by local officials and the authority which New York law grants to municipalities in the operation of local airports, (footnote omitted) we believe that the district court was correct in holding that appellant failed to state a claim upon which relief can be granted under the Clayton Act for damages against the Town of East Hampton. The Act bars such a claim.

784 F.2d at 94–95.

Noting, however, that the 1984 Act does not apply to claims for injunctive relief under the Sherman Act [referring to 15 U.S.C. § 35; H.R.Rep. No. 98–965, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4602, 4603], the *Montauk* court then observed that the question of whether the district court properly dismissed Montauk's Sherman Act claim for injunctive relief had to be examined in light of the Supreme Court's decision in *Hallie* wherein certain townships sought injunctive relief, alleging that the City of Eau Claire violated the Sherman Act by acquiring a monopoly over the provision of sewage treatment services and by tying such services to sewerage collection and transportation services. Then wrote the *Montauk* court:

> In holding that the municipality was immune from such antitrust actions, the Court reexamined the line of cases which established the state action immunity doctrine. *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982).

> *Hallie* broadened the immunity available to municipalities. To be exempted from antitrust violations, municipalities must establish "that their anticompetitive activities were authorized by the State 'pursuant to state policy to displace competition with regulation or monopoly public service.'" *Hallie, supra,* 435 U.S. at 413, 98 S.Ct. at 1137. A municipality will be entitled to the protection of the state action exemption where it "demonstrate[s] that it is engaging in the challenged activity pursuant to a clearly expressed state policy." *Hallie, supra,* 105 S.Ct. at 1717.

> The *Hallie* Court, however, interpreted broadly a "clear articulation" requirement of state policy. It is not necessary for the state legislature to have stated explicitly that it expected a municipality

to engage in conduct having anticompetitive effects. *Id.* at 1718. Rather, if the legislature " 'contemplated the kind of action complained of', this is sufficient to satisfy the clear articulation requirement of the state action test." *Hallie, supra,* 105 S.Ct. at 1719 (quoting *City of Lafayette, supra,* 435 U.S. at 415, 98 S.Ct. at 1138). The Court also abandoned the requirement that, to be exempt, the state must supervise actively the municipality's activity. *Id.* 105 S.Ct. at 1721.

> 784 F.2d at 95.

In light of the Supreme Court's *Hallie* case with respect to the immunity of municipalities from antitrust violations, the *Montauk* court next turned to an analysis of the New York statutes conferring authority on municipalities to operate local airports and determined that New York had declared a state policy that municipal airport operators could enter into exclusive lease arrangements which effectively replaced competition with regulation. The court therefore concluded that it must assume that the New York legislature contemplated the kind of anti-competitive activity in which the Town of East Hampton had engaged. Wrote the court:

> In view of this broad statutory authority to enter into exclusive or non-exclusive contracts, it was a foreseeable result that the Town would assert the authority to deny appellant year-long operating rights. Such conduct is a foreseeable consequence of granting to municipalities the power to pursue either anti-competitive action or free-market competition in the area of airport services. The grant of this power is inconsistent with a "neutral ... state policy." *Hallie, supra,* 105 S.Ct. at 1718. We hold that the *Hallie* state action test therefore was complied with in this case. (footnote omitted)
>
> 784 F.2d at 96.

Having held that the Local Government Antitrust Act of 1984 and the state action doctrine barred the antitrust claims against the Town of East Hampton, the *Montauk*

court next held there was no basis for holding that East Hampton Aire conspired with the Town to violate the antitrust laws and that the district court properly dismissed the claims against East Hampton Aire.

■ Based upon the express language of the Local Government Antitrust Act of 1984 [15 U.S.C. §§ 34–36], the legislative history of the Act, the terms and provisions of The Health Care Authorities Act of 1982 [§ 22–21–310 *et seq.,* Code of Alabama 1975] under which The Health Care Authority of The City of Huntsville was reincorporated[9] on April 14, 1986 and has thereafter existed,[10] the stipulation of facts on the record by the parties with respect to the individual Huntsville Hospital defendants and their respective relationship to the Health Care Authority of the City of Huntsville [ante, p. 1491], the facts and law of which the Court has taken judicial notice [ante, pp. 1490–91], and the case authorities previously cited and discussed herein which the Court finds thoroughly persuasive and chooses to follow in the absence of binding precedent from the United States Supreme Court and the Eleventh Circuit Court of Appeals, the Court determines and holds that the defendants The Health Care Authority of the City of Huntsville d/b/a Huntsville Hospital, T. Alvin Blackwell [Chairman of the Board of Directors of Hospital], Charles E. Selah, M.D. [member of board of Directors of Hospital], Edward D. Boston [CEO of Hospital] and Ronald S. Owen are each immune from plaintiff's Count 1 claim for damages alleging antitrust violations by these defendants of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 under the Local Government Antitrust Act of 1984, 15 U.S.C. §§ 34–36. Clearly, The Health Care Authority of The City of Huntsville d/b/a Huntsville Hospital is a "local government" within the definitions of that term stated in 15 U.S.C. § 34(1)(A) and (B). The particular provisions of The Health Care Authorities Act of 1982 hereinabove referenced

---

**9.** With the consent and concurrence of the City of Huntsville, a municipal corporation.

**10.** The Court particularly refers to § 22–21–318(a)(31) and § 22–21–318(c)(1) and (c)(2) previously referenced. Ante at p. 1492.

under which the Authority was reincorporated on April 14, 1986 and has existed thereafter demonstrate a state policy clearly articulated and affirmatively expressed.

Moreover, the individual Huntsville Hospital defendants above referenced come under two areas of the 1984 Act. First, each such defendant is to be considered an "official or employee . . . acting in an official capacity. 1984 Act § 3(a). Second, each is to be considered a "person" whose actions were "based on any official action directed by a local government, or official or employee acting in an official capacity." *Id.* § 4(a). The Congress plainly intended that the phrase "acting in an official capacity" be given broad meaning. Furthermore, an affirmative grant of explicit authority is not required for an employee or local government official to be acting in an official capacity under the 1984 Act. The standards for determining whether these individual defendants acted in an official capacity, or were directed by government officials or employees acting in an official capacity, are objective ones. As hereinafter discussed, these standards do not include a consideration of the defendant's intentions. Here the court considers only the objective question whether, in light of the authority invested in a local government, its officials or employees, the actions complained of were lawful and taken within the scope of their authority. *Sandcrest,* 853 F.2d at 1147. This Court holds that they were.

Finally, the allegations of Count 1 that the acts of these defendants were done pursuant to a conspiracy to restrain competition and to monopolize the practice of radiation/oncology within the relevant market in violation of §§ 1 and 2 of the Sherman Act and plaintiff's argument at the special motion docket to the effect that allegations of a conspiracy convert otherwise authorized conduct into unauthorized conduct would require consideration of whether the subjective motives or intentions of these Huntsville Hospital defendants were to benefit themselves rather than the hospital. This Court concurs with

Mr. Justice Powell's expressed point in *Sandcrest* that the LGAA makes no provision for consideration of a defendant's motives and that an allegation that an act was done pursuant to a conspiracy is akin to an allegation that it was done in bad faith or with malice. 853 F.2d at 1146.

No genuine issue of material fact exists to justify the denial of summary judgment on the question of the antitrust immunity against monetary damages conferred on The Health Care Authority of The City of Huntsville d/b/a Huntsville Hospital and the defendants Blackwell, Selah, M.D., Boston and Owen by the Local Government Antitrust Act. The 12(b)(1), Fed.R.Civ.P., motion to dismiss of the Huntsville Hospital defendants directed to plaintiff Parker's claim against such defendants *for monetary damages* [11] under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, is therefore due to be granted and such claim dismissed with prejudice because of the absolute immunity conferred upon such defendants against antitrust damage liability by the provisions of the Local Government Antitrust Act of 1984, 15 U.S.C. § 34 *et seq.*

[Issue of exemption of Huntsville Hospital defendants from federal antitrust liability, including antitrust claim for injunctive relief, under the "state action doctrine".]

■ The Huntsville Hospital defendants are clearly immune from Dr. Parker's antitrust attack under the state action doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Such state action immunity encompasses both claims for damages arising from alleged antitrust violations and from suits seeking injunctive relief because of alleged antitrust violations.

Under the teaching of *Parker,* official conduct is immune from federal antitrust scrutiny if the state legislature "contemplated the kind of action complained of." *Commuter Transportation Systems, Inc. v. Hillsborough County,* 801 F.2d 1286, 1289 (11th Cir.1986).

**11.** The Local Government Antitrust Act of 1984 does not immunize these defendants from suits seeking injunctive relief because of alleged antitrust violations.

■ In the instant case the Legislature of Alabama by its enactment of the Health Care Authorities Act of 1982, § 22–21–310 *et seq.*, Code of Alabama 1975, as amended, authorized health care authorities such as The Health Care Authority of The City of Huntsville:

(5) To acquire, construct, reconstruct, equip, enlarge, expand, alter, repair, improve, maintain, equip, furnish and operate health care facilities at such place or places, within and without the boundaries of its authorizing subdivisions and within and without the state, as it considers necessary or advisable;

§ 22–21–318(a)(5), Ala.Code.

(6) To lease or otherwise make available any health care facilities or other of its properties and assets to such persons, firms, partnerships, associations or corporations and on such terms as the board deems to be appropriate, to charge and collect rent or other fees or charges therefor and to terminate any such lease or other agreement upon the failure of the lessee or other party thereto to comply with any of its obligations thereunder.

§ 22–21–318(a)(6), Ala.Code.

(7) To receive, acquire, take and hold (whether by purchase, gift, transfer, foreclosure, lease, devise, option or otherwise) real and personal property of every description, or any interest therein, and to manage, improve and dispose of the same by any form of legal conveyance or transfer; ...

§ 22–21–318(a)(7), Ala.Code.

(8) To mortgage, pledge or otherwise convey its property and its revenues from any source;

§ 22–21–318(a)(8), Ala.Code.

(9) To borrow money in order to provide funds for any lawful corporation, function, use or purpose and, in evidence of such borrowing, to sell and issue interest-bearing securities in the manner provided and subject to the limitations set forth hereinafter;

§ 22–21–318(a)(9), Ala.Code.

(10) To pledge for payment of any of its securities and revenues (including proceeds from any hospital tax to which it may be entitled) and to mortgage or pledge any or all of its health care facilities or other assets or properties or any part or parts thereof, whether then owned or thereafter acquired, as security for the payment of the principal of and the interest and premium, if any, on any securities so issued and any agreements made in connection therewith;

§ 22–21–318(a)(10), Ala.Code.

(11) To provide instruction and training for, and to contract for the instruction and training of, nurses, technicians and other technical, professional and paramedical personnel;

§ 22–21–318(a)(11), Ala.Code.

(12) To select and appoint medical and dental staff members and others licensed to practice the healing arts and to delineate and define the privileges granted each such individual;

§ 22–21–318(a)(12), Ala.Code.

(14) To contract for the operation of any department, section, equipment or holdings of the authority, and to enter into agreements with any person, firm or corporation for the management by said person, firm or corporation on behalf of the authority of any of its properties or for the more efficient or economical performance of clerical, accounting, administrative and other functions relating to its health care facilities;

§ 22–21–318(a)(14), Ala.Code.

(15) To establish, collect and alter charges for services rendered and supplies furnished by it;

§ 22–21–318(a)(15), Ala.Code.

(16) To make all needful or appropriate rules and regulations for the conduct of any health care facilities and other properties owned or operated by it and to alter such rules and regulations;

§ 22–21–318(a)(16), Ala.Code.

(19) To cooperate with the state board of health and the state department of mental health and to make contracts with either of said agencies respecting the operation of any health care facilities or other properties owned or operated by it,

whether as an agent for either or both of said agencies or otherwise;

§ 22–21–318(a)(19), Ala.Code.

(20) To enter into contracts with, to accept aid, loans and grants from, to cooperate with and to do any and all things not specifically prohibited by this article or the Constitution of the state that may be necessary in order to avail itself of the aid and cooperation of the United States of America, the state, any county or municipality, or any agency, instrumentality or political subdivision of any of the foregoing in furtherance of the purposes of this article; to give such assurances, contractual or otherwise, to or for the benefit of any of the foregoing as may be required in connection with, or as conditions precedent to the receipt of, any such aid, loan or grant; and to take such action not in violation of law as may be necessary in order to qualify the authority to receive funds appropriated by any of the foregoing;

§ 22–21–318(a)(20), Ala.Code.

The term *"health care facilities"* used in the Alabama code sections referenced in the preceding paragraph is defined by the provisions of § 22–21–311 [Definitions] of The Health Care Authorities Act of 1982 as follows:

(13) Health Care Facilities. Generally, any one or more buildings or facilities which serve to promote the public health, either by providing places or facilities for the diagnosis, treatment, care, cure or convalescence of sick, injured, physically disabled or handicapped, mentally ill, retarded or disturbed persons, or for the prevention of sickness and disease, or for the care, treatment and rehabilitation of alcoholics, or for the care of elderly persons, or for research with respect to any of the foregoing, including, without limiting the generality of the foregoing:

a. Public hospitals of all types, public clinics, sanitoria, public health centers and related public health facilities, such as medical or dental facilities, laboratories, out-patient departments, educational facilities, nurses' homes and nurses' training facilities, dormitories or residences for hospital personnel or students, other employee-related facilities, central service facilities operated in connection with public hospitals and other facilities (such as, for example, gift and flower shops, cafe and cafeteria facilities and the like) ancillary to public hospitals;

b. Retirement homes, nursing homes, convalescent homes, apartment buildings, dormitory or domiciliary facilities, residences or special care facilities for the housing and care of elderly persons or other persons requiring special care;

c. Appurtenant buildings and other facilities:

1. To provide offices for persons engaged in the diagnosis, treatment, care or cure of diseased, sick or injured persons, or in preventive medicine, or in the practice of dentistry; or

2. To house or service equipment used for the diagnosis, treatment, care or cure of diseased, sick or injured persons, or in preventive medicine, or in the practice of dentistry, or the records of such diagnosis, treatment, care, cure or practice or research with respect to any of the foregoing;

d. Parking areas, parking decks, facilities, buildings and structures appurtenant to any of the foregoing;

e. Ambulance, helicopter and other similar facilities and services for the transportation of sick or injured persons; and

f. Machinery, equipment, furniture and fixtures useful or desirable in the operation of any of the foregoing.

§ 22–21–311(13), Ala.Code.

Under § 22–21–318 [Powers of authority], Alabama Code 1975, as amended, The Health Care Authorities Act of 1982 significantly provides:

(a) In addition to all other powers granted elsewhere in this article, and subject to the express provisions of its certificate of incorporation, an authority shall have the following powers, together with all powers incidental thereto or nec-

essary to the discharge thereof in corporate form:

\*   \*   \*   \*   \*   \*

(31) To exercise all powers granted hereunder in such manner as it may determine to be consistent with the purposes of this article, notwithstanding that as a consequence of such exercise of such powers it engages in activities that may be deemed *"anticompetitive"* within the contemplation of the antitrust laws of the state or of the United States; and

§ 22–21–318(a)(31), Ala.Code.

(c) As a basis for the power granted in subdivision (31) of the preceding subsection (a), the legislature hereby:

(1) Recognizes and contemplates that the nature and scope of the powers conferred on authorities hereunder · are such as may compel each authority, in the course of exercising its other powers or by virtue of such exercise of such powers, to engage in activities that may be characterized as *"anticompetitive"* within the contemplation of the antitrust laws of the state and of the United States; and

(2) Determines, as an expression of the public policy of the state with respect to the displacement of competition in the field of health care, that each authority, when exercising its powers hereunder with respect to the operation and management of health care facilities, acts as an agency or instrumentality of its authorizing subdivisions and as a political subdivision of the state. (Emphasis added)

§ 22–21–318(c)(1), (c)(2), Ala.Code.

Thus, if in fact and in law the activities of the Huntsville Hospital defendants about which plaintiff here complains in Count 1 of his complaint (alleged antitrust violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2) would otherwise be characterized as "anticompetitive" with-

in the contemplation of the antitrust laws of the state or of the United States, it is clear and certain that their official actions pertaining to the treatment by Huntsville Hospital of cancer patients by radiation/oncology were contemplated by the Alabama Legislature and that under *Parker* such defendants are immunized.[12] The rationale of such immunity has been explained by the United States Supreme Court:

We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

*Parker*, 317 U.S. at 350–51, 63 S.Ct. at 313–14.

The Supreme Court in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), held that a local government is immune from antitrust attack if "it is engaging in the challenged activity pursuant to a clearly expressed state policy." Justice Powell delivered the *Hallie* opinion for the Court and at the outset framed the issue to be decided:

This case presents the question whether a municipality's anticompetitive activities are protected by the state action exemption to the federal antitrust laws established by *Parker v. Brown* (citation omitted) when the activities are authorized, but not compelled by the State, and the State does not actively supervise the anticompetitive conduct.

The facts of *Hallie* are:

Petitioners, unincorporated townships located in Wisconsin adjacent to respondent city, filed suit against respondent in Federal District Court, alleging that peti-

---

**12.** The Eleventh Circuit Court of Appeals in *Commuter Transportation Systems, Inc. v. Hillsborough County*, 801 F.2d at 1289, observed: "*Harlow* and *Parker* each provide *"immunity from suit"* rather than a mere defense to liabili-

ty" (emphasis in original), citing *Mitchell v. Forsyth*, 472 U.S. 511, 521, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). The *Harlow* case referred to in this quotation is *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

tioners were potential competitors of respondent in the collection and transportation of sewage, and that respondent had violated the Sherman Act by acquiring a monopoly over the provision of sewage treatment services in the area and by typing the provision of such services to the provision of sewage collection and transportation services. Respondent refused to supply sewage treatment services to petitioners, but supplied the services to individual landowners in petitioners' areas if a majority of the individuals in the area voted by referendum election to have their homes annexed by respondent and to use its sewage collection and transportation services. The District Court dismissed the complaint, finding, *inter alia*, that Wisconsin statutes regulating the municipal provision of sewage services expressed a clear state policy to replace competition with regulation. The court concluded that respondent's allegedly anticompetitive conduct fell within the "state actin" exemption to the federal antitrust laws established by *Parker v. Brown*, 317 U.S. 341 [63 S.Ct. 307, 87 L.Ed. 315 (1943)]. The Court of Appeals affirmed.

> *Hallie,* 417 U.S. at 34, 105 S.Ct. at 1714.

The holdings of the *Hallie* court are summarized as follows: The Town of Hallie's anticompetitive activities are protected by the state action exemption to the federal antitrust laws. Before a municipality may claim the protection of the state action exemption, it must demonstrate that it is engaging in the challenged activity pursuant to a "clearly articulated" state policy. *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). Wisconsin statutes grant authority to cities to construct and maintain sewage systems, to describe the district to be served, and to refuse to serve unannexed areas. The statutes are not merely neutral on state policy but, instead, clearly contemplate that a city may engage in anticompetitive conduct. To pass the "clear articulation" test, the legislature need not expressly state in a statute or the legislative history that it intends for the delegat-

ed action to have anticompetitive effects. The Wisconsin statutes evidence a clearly articulated state policy to displace competition with regulation in the area of municipal provision of sewage services. The "clear articulation" requirement of the state action test does not require that respondent show that the State "compelled" it to act. Although compulsion affirmatively expressed may be the best evidence of state policy, it is by no means a prerequisite to a finding that a municipality acted pursuant to clearly articulated state policy. *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), and *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), distinguished. Active state supervision of anticompetitive conduct is not a prerequisite to exemption from the antitrust laws where the actor is a municipality rather than a private party. The requirement of active state supervision serves essentially the evidentiary function of ensuring that the actor is engaging in the challenged conduct pursuant to state policy. Where the actor is a municipality rather than a private party, there is little or no danger that it is involved if a *private* price-fixing arrangement. The danger that a municipality will seek to further purely parochial public interests at the expense of more overriding state goals is minimal, because of the requirement that the municipality act pursuant to a clearly articulated state policy.

### [CONSPIRACY ISSUE]

■ There is no illicit conspiracy issue here presented. However, assuming arguendo that such issue emerges from this summary judgment record, it is the law of this circuit that the antitrust plaintiff must show a conspiracy *not authorized by state law* and thus beyond the protection of state action immunity. *Commuter Transportation Systems, Inc. v. Hillsborough County, supra,* 801 F.2d at 1291; *Greyhound Rent-A-Car, Inc. v. City of Pensacola,* 676 F.2d 1380 (11th Cir.1982, *cert. denied,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983). No such showing has been

made by this plaintiff physician who has further wholly failed to demonstrate the existence of any genuine issue of fact that would warrant trial on the state action immunity defense.

An appropriate order will be entered granting the motion of the Huntsville Hospital defendants for summary judgment in their favor with respect to the federal antitrust claims for relief herein asserted by the plaintiff Parker against such movant defendants.

[PENDANT STATE LAW CLAIMS]

In the exercise of its sound discretion and there being no statute of limitations issue to be considered, the Court declines to assert pendant jurisdiction over plaintiff's state law claims for relief [Counts 2–5, inclusive] against the Huntsville Hospital defendants. An order dismissing these claims without prejudice as against these particular defendants . will be entered.[13]

13. The Health Care Authorities Act of 1982, § 22–21–310 *et seq.*, Code of Alabama 1975, as amended, in the opinion of the Court effectively and fully immunizes the Huntsville Hospital defendants with respect to plaintiff's state law claims for relief asserted if Counts 2–5, inclusive, of plaintiff's complaint, if any such count otherwise states a state law claim upon which relief can be granted.